CREDIT MANAGERS ASSOCIATION OF SOUTHERN CALIFORNIA, a California Corporation, Plaintiff,

v.

The FEDERAL COMPANY, a Delaware corporation, Defendant.

No. CV 84–3098–ER(Tx).

United States District Court, C.D. California.

Dec. 6, 1985.

As Amended Jan. 15, 1986.

Anthony Castanares, Stutman Treister & Glatt, Los Angeles, Cal., for plaintiff.

Ralph J. Shapiro, David Pettit, O'Melveny & Myers, Los Angeles, Cal., for defendant.

## AMENDED MEMORANDUM OPINION

RAFEEDIE, District Judge.

This matter came on for trial March 26–28, 1985, Cynthia Cohen and Michael Yaffa of Stutman, Treister & Glatt appearing for plaintiff and Ralph J. Shapira and David Petit of O'Melveny & Myers appearing for defendant. Plaintiff is a California citizen and defendant a citizen of Tennessee and Delaware. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(a). The parties agree that California substantive law applies.

## I. INTRODUCTION

Plaintiff Credit Managers Association of Southern California ("Credit Managers") is the assignee of an assignment for the benefit of creditors of Crescent Food Company ("Crescent"). Crescent sold and distributed gourmet foods, including imported cheeses, to delicatessens and supermarkets in California.

Prior to May 1982, defendant the Federal Company ("Federal") owned 100 percent of Crescent's stock. In May Federal sold the stock for $1,435,932 to Teeple-Reizer Acquisition Company ("TRAC"), an entity formed by the top management of Crescent for the purpose of acquiring Crescent. The sale of the stock by Federal to TRAC was what is commonly referred to as a leveraged buyout, the acquiring company (TRAC) financing the purchase of the stock by borrowing against the assets of the acquired company (Crescent).

On October 17, 1983, a year and five months after the buyout, Crescent was in financial difficulty and executed a general assignment for the benefit of creditors. Plaintiff Credit Managers is the assignee and brings this action seeking substantially to set aside the leveraged buyout and to bring back into Crescent certain assets

transferred to Federal as payment for Crescent's stock. Plaintiff seeks to have these assets held in a constructive trust for the benefit of the unpaid claims of Crescent's creditors.

## II. PLAINTIFF'S LEGAL THEORIES

In many ways, this is a case of first impression, there being no precedent directly on point.[1] While much has been written about fairness to shareholders when a public company "goes private" through a leveraged buyout,[2] little has been written about fairness to creditors.[3] Because a leveraged buyout by definition involves borrowing heavily against the assets of a company, the creditors of that company face a much more highly leveraged company after the buyout than before. If the company's cash flow cannot service this new debt—either because of the size of the debt service or a business downturn decreasing the company's income or a combination of the two— the company often must cease operations, leaving accounts payable unpaid. This, according to plaintiff, is what happened to Crescent. Plaintiff comes before this court seeking to undo the buyout proceeding under three legal theories: (1) the transfer of some of Crescent's assets to Federal as part of the purchase price for the Crescent stock was a fraudulent conveyance; (2) the transfer of some of these assets was an unlawful distribution to Crescent's shareholders; and (3) Federal's claims against Crescent should be equitably subordinated

to the claims of Crescent's creditors. These theories will be examined *infra*. First the court will briefly review the details of the buyout and Crescent's subsequent financial difficulties.

## III. FACTS

From November 1975 to May 1, 1982, Crescent was a wholly owned subsidiary of Federal. Crescent's major fixed asset was a warehouse in Vernon, California valued at approximately $2 million (hereinafter "the warehouse"). Crescent's major liability was approximately $7.25 million in debt owed to Federal. This intercompany loan was an unsecured demand loan bearing interest at a rate of ten percent per annum.

In the early 1980's Federal decided to sell Crescent primarily because of Crescent's poor financial performance and Federal's inability to do anything to improve that performance. While a number of companies expressed interest in Crescent, Federal ultimately decided to sell the company to its management in a leveraged buyout. To accomplish this, Crescent's management formed TRAC and capitalized it at $450,000. Teeple and Reizer, principals of TRAC and top management at Crescent, invested $85,000. Others invested the remaining $365,000. On May 1, 1982 Federal and TRAC entered into a stock purchase agreement for the sale of Crescent's stock to TRAC. The price for the shares was $1,435,932, the book value of Crescent. TRAC paid $235,932 in cash and executed a

---

1. *United States v. Gleneagles Inv. Co., Inc.,* 565 F.Supp. 556 (M.D.Penn.1983) (hereinafter *"Gleneagles"*) also examines whether a leveraged buyout was a fraudulent conveyance. *Gleneagles* is different from the instant case because plaintiff there proved violations of Sections 6 and 7 of the Uniform Fraudulent Conveyance Act which require a showing of intentional fraud. Plaintiff Credit Managers alleges constructive fraud by defendant Federal, a violation of Section 5 of the Uniform Fraudulent Conveyance Act. Plaintiff does not allege intentional fraud.

2. *E.g.* McCune and Van Kirk, "Leveraged Buyouts by Management," 16 *Rev. of Securities Regulation* No. 22 at 769 (Dec. 22, 1983); Denham, "Going Private," *Los Angeles Lawyer* (June 1985).

3. *E.g.* Baird & Jackson, "Fraudulent Conveyance Law and Its Proper Domain," 38 *Vand.L.Rev.,* 829, 850–854 (1985); "Leveraged Buyout Alleged as Fraud in Bankruptcy Case," *Legal Times of Washington* at 1 (October 21, 1985). The latter article discusses the leveraged buyout of Table Talk, Inc., formerly the world's largest producer of pies, and its subsequent bankruptcy. Table Talk's trustee is attempting to set aside the leveraged buyout as a fraudulent conveyance. *Cataldo v. Karol,* No. 85–3618–Y, D.Mass. The trustee has sued both Squibb, the company that sold Table Talk, Inc., and Texas General Corp., the company that bought it. In the instant action plaintiff has sued only Federal, the company that sold Crescent, not TRAC, the company that bought it.

promissory note for $1.2 million in favor of Federal bearing interest at the rate of ten percent per annum for the balance. Both TRAC and Crescent executed the note.

On May 7, 1982, as security for the $1.2 million note, Crescent executed a First Trust Deed and Assignment of Rents ("Deed of Trust") in favor of Federal which placed a lien on the warehouse for the amount outstanding on the note.

Also as part of the TRAC-Federal transaction, Crescent paid off the $7.25 million intercompany debt owed to Federal. Crescent accomplished this by borrowing that amount from the General Electric Credit Corporation ("GECC"). The GECC loan was secured by all the assets of Crescent (*e.g.* accounts receivables, inventory, machinery, equipment and a second trust deed on all real property) and bore an interest rate generally ranging from 16 to 21 percent.[4] The GECC line of credit to Crescent was for a maximum of $7.5 million. Exhibit 29. There were several other relatively insignificant cash adjustments between Federal and Crescent as part of the sale of Crescent's stock involving prepaid casualty insurance premiums and income tax refunds. *See Plaintiff's Memorandum of Contentions of Fact and Law* at 2 n. 3 (hereinafter *"Plaintiff's Memorandum"*).

Shortly after the transaction, TRAC loaned $189,000, which was most of its remaining cash, to Crescent. Crescent's new management also changed the name of the company to Crescent Reese Foods ("Crescent Reese") and publicized the buyout to those it did business with.

It is obvious that Crescent was much more heavily leveraged after the stock sale than before. Crescent took on a $1.2 million lien against its warehouse and it refinanced a $7.25 million unsecured loan at 10 percent interest with a $7.25 million secured loan at 16 to 20 percent interest. It is not disputed that Crescent's debt service

increased significantly because of the buyout.

In November of 1982, six months after the buyout, GECC extended Crescent an additional line of credit for $2.5 million bringing Crescent's total potential borrowing from GECC to $10.0 million.

After the May 1982 buyout, Crescent experienced four setbacks to its business: (1) Suppliers, concerned that Crescent was no longer part of Federal, a much larger company, extended less trade credit to Crescent, requiring earlier payment of bills; (2) Crescent's competitors started giving their customers a longer period in which to pay their bills, a practice that Crescent was forced to match; (3) Crescent workers went on strike which resulted in an interruption of the business for approximately two months and destruction of some Crescent property; and (4) Crescent lost business due to the shut down of some of its customers' stores. Defendant contends that these setbacks did Crescent in, not the leveraged buyout. Plaintiff contends that because Crescent had unreasonably small capital, it was unable to survive these four setbacks. Plaintiff further contends that even without these setbacks, the leveraged buyout and the concomitant increase in Crescent's debt service made Crescent's demise inevitable.

In October of 1983, with accounts payable at approximately $3.0 million and with insufficient cash to continue operations and no borrowing capacity, Crescent shut down, executing an assignment of its assets for the benefit of creditors, a statutory alternative to bankruptcy under California Code of Civil Procedure § 493.010. At the time of trial, plaintiff Credit Managers continued to operate Crescent's cheese importation and distribution business, deciding that continued operation was more beneficial to creditors than the other alternative, the bankruptcy of Crescent.

In reaching a decision in this case, the court was required to make a number of

---

**4.** The GECC loan bore interest at a rate of 1.30 to 3.05 percent over prime rate, the prime rate being defined as the highest prime rate charged by specified banks or the ninety day prime

commercial rate, whichever was higher. If the prime rate was 13 percent, the interest rate was about 16 percent. If the prime rate was 20, the interest rate was about 21 percent.

factual findings about how certain assets and liabilities should be valued and accounted for on Crescent's balance sheet. These findings are discussed again *infra,* but are stated below as specific findings of the court:

1. The present value (on May 7, 1982) of TRAC and Crescent's $1.2 million obligation to Federal, given the below market interest rate on the five-year loan, was $900,000;

2. The $189,000 "loan" from TRAC to Crescent was, in fact, a capital contribution to Crescent as TRAC never demanded repayment; and

3. The fair market value of Crescent's fixed assets on May 7, 1982 exceeded the $1,382,228 stated on Crescent's balance sheet in the fixed assets minus depreciation category.

## IV. FRAUDULENT CONVEYANCE

### A. Threshold Issues

In attempting to apply the law of fraudulent conveyances to a leveraged buyout, plaintiff seeks to apply a law with its origins in 16th century England[5] to a financial transaction which did not exist on a large scale until the 1980's. As a threshold matter, it is not at all clear that fraudulent conveyance law is broadly applicable to leveraged buyouts:

> The reach of fraudulent conveyance law has not been an issue for much of this century. The issue has become an important one in the 1980's however. Identifying the precise reach of fraudulent conveyance law is the crucial inquiry in several important legal disputes, such as whether ... a leveraged buyout is a fraudulent conveyance.

> ....

> An important conceptual question is whether a leveraged buyout in fact presents fraudulent conveyance problems.... A firm that incurs obligations in the course of a buyout does not seem at all like the Elizabethan deadbeat who sells his sheep to his brother for a pittance.

Baird & Jackson, "Fraudulent Conveyance Law and Its Proper Domain," 38 *Vand.L. Rev.,* 829, 832–33, 852 (hereinafter "Baird & Jackson"). As this "important conceptual question" was not briefed by the parties, and as there are other grounds for its decision, the court does not answer the question. It should be stated, however, that in analyzing plaintiff's claims, the court does not mean to suggest that it believes fraudulent conveyance law is generally and broadly applicable to leveraged buyouts. To the contrary, Baird & Jackson's article presents compelling arguments why it should not be.[6]

Assuming that fraudulent conveyance law is applicable to all leveraged buyouts, there is yet another threshold question— whether plaintiff represents creditors who have a right to complain about the conveyance that made TRAC's buyout of Crescent possible. Plaintiff proposes that the court make the following finding of fact: "As of May 7, 1982 and continuing thereafter through the present, there are one or more creditors of Crescent who hold matured claims against Crescent in excess of the total recovery sought herein and who are beneficiaries of the general assignment to Credit Managers for the benefit of creditors executed on October 17, 1983." *Plaintiff's Proposed Finding of Fact* 49. *See also Plaintiff's Memorandum* at 15–16 and n. 10. The implication of the proposed

---

**5.** 13 Eliz., ch. 5. *See In re Madrid,* 725 F.2d 1197, 1199–200 (9th Cir.1984) (historical review of fraudulent conveyance law in the bankruptcy area).

**6.** Baird & Jackson's main point is that leveraged buyouts can be beneficial to creditors. A company can and often does do better under new management, especially when the new managers have personally invested in the enterprise.

If creditors have the right to retroactively attack the buyout if the company fails, buyouts will be deterred even when they would be in the best interest of all involved. In fraudulent conveyance cases, courts only examine buyouts that fail. Rulings in such cases, however, affect all future leveraged buyouts by creating potential liability for stockholders of companies that go private.

finding, if not its express wording, is that all creditors held substantial matured claims at the birth of Crescent Reese Foods (the date of the buyout) and at its death (the date of the assignment). There can be no quarrel that creditors held claims on the date of the assignment (October 17, 1983), but the evidence presented at trial did not show these creditors held substantial claims on the date of the buyout (May 7, 1982). In fact, most claims arose after the buyout.

Exhibit 143 is a balance sheet for Crescent and Crescent Reese prepared by an accounting firm retained by plaintiff. After adjustments it shows that Crescent owed about $2.5 million to trade creditors (accounts payable-trade) at the time of the buyout. An accountant retained by plaintiff, Kenneth Goldman, testified at trial that at the time of the assignment creditors' claims were approximately $3.0 million. This $500,000 increase shows that at least $500,000 of the unpaid accounts payable arose after the buyout. More importantly, plaintiff's accountant's testimony also shows that the creditors in 1983, for the most part, were not the same as those who were creditors in May of 1982 when the buyout occurred. Using Exhibit 151, plaintiff's accountant testified that there were three trade creditors who were owed money at the time of the buyout—Infofoods, Hertz, and Fromageries Bel. Exhibit 151 shows these three creditors were owed approximately $130,000. This evidence proves that much of the credit extended by existing creditors was extended *after* the buyout. Finally, plaintiff's accountant testified that the $130,000 in accounts payable that existed on May 7, 1982 was paid shortly after the buyout, proving that at that time the creditors plaintiff represents were owed no money at all and that their current claims arose exclusively from credit extended after the buyout.

The evidence shows that the creditors had knowledge of Crescent's new ownership and the change in the name of the company. Creditors had at least some knowledge of the financial impact the buyout had on the company because the credi-

tors demanded quicker payment from the new Crescent (Crescent Reese) on accounts payable than they had from the old Crescent. These creditors made a post-buyout decision to extend credit on new terms to a new entity, an entity with a very different financial structure than its predecessor. As the creditors plaintiff represents did not have any substantial stake in Crescent at the time of the buyout, there does not appear to be a strong reason to give these creditors the right to attack the buyout as harmful to them. It would seem that if leveraged buyouts are to be susceptible to attack on fraudulent conveyance grounds, only those who were creditors at the time of the transaction should have a right to attack the transaction. The limited law and scholarship on the subject supports this observation. In *U.S. v. Gleneagles Investment Co.*, 565 F.Supp. 556 (M.D.Pa. 1983), the earliest and apparently the only published case examining the leveraged buyout-fraudulent conveyance question, the court made specific findings that each creditor who sued to set aside the conveyance held a matured claim on the date of the conveyance. In separate findings of fact, the court stated the name of the creditor and the amount they were owed on November 23, 1973, the date of the alleged fraudulent conveyance in that case. *Id.* at 572, *Findings of Fact* 155–60. Plaintiff Credit Managers has not provided the court with evidence to make similar findings in this case (*i.e.* the names of each creditor and the amount owed on May 7, 1982, the date of the execution of the Deed of Trust). In fact, the evidence that was presented as analyzed above proves the October 1982 creditors were, for the most part, not creditors in May of 1983.

A similar conclusion that creditors must hold matured claims the day of the buyout is implied in Baird & Jackson's article. The transaction they examine involves general creditors who were owed $4 million at the time of the buyout and later sued to set aside the conveyance. Baird & Jackson, *supra* at 850.

It is unclear whether it is legally significant that plaintiff does not represent creditors who were creditors at the time of the buyout. Section 5 of The Uniform Fraudulent Conveyance Act under which plaintiff sues states:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is *fraudulent as to creditors and as to other persons who become creditors during the continuation of such business* or transaction without regard to his actual intent.

Cal.Civil Code § 3439.05 (emphasis added). The statute clearly covers future as well as existing creditors. However, when the California legislature passed this provision in 1939, it clearly did not intend to cover leveraged buyouts which are very public events. The legislature was addressing, instead transactions that have the earmarks of fraud. The conveyance in this case occurred in May of 1982. Despite the fact that creditors knew of the conveyance, creditors chose to wait two years, until May of 1984, to file this case challenging the buyout. This presents the question of whether defendant is entitled to raise a laches defense, an issue which both parties have discussed. If there is no limit on when a creditor can sue to set aside a transfer, fraudulent conveyance law becomes an insurance policy for creditors of companies that have gone private. Credit could liberally be extended to such companies regardless of their assets or cash flow with the knowledge that the buyout could always be attacked later if the company folded. A judicially created statute of limitations through the development of a lach-

es defense might be appropriate to limit fraudulent conveyances actions so that they would not be brought each and every time a leveraged buyout failed. Bankruptcy law has such a limit under 11 U.S.C. § 548 allowing challenges only to conveyances made within one year of the filing of a bankruptcy petition. In the instant case, the date analogous to the filing of a bankruptcy petition would be the date of the assignment, October 17, 1983. The alleged fraudulent conveyance was more than one year before that date. There is no apparent reason why creditors of a company that has executed an assignment for benefit of creditors should have a longer period of time to set aside a conveyance than creditors of a company that has filed bankruptcy.

The two threshold issues discussed above are important conceptual and legal questions raised by this case. Because the parties did not brief the important questions of whether fraudulent conveyance law is generally and broadly applicable to leveraged buyouts and whether, if it is, creditors challenging the transaction must be creditors at the time of the transaction, the court does not rule on the fraudulent conveyance claim on these grounds.[7]

### B. Was There a Fraudulent Conveyance?

Plaintiff alleges that the obligations to Federal incurred by Crescent as a result of the buyout violated California Civil Code § 3439.05 (hereinafter "Section 5 of the Uniform Fraudulent Conveyance Act" or "Section 5"). Crescent, along with TRAC, signed the $1.2 million promissory note to Federal. Crescent also executed the Deed of Trust in Federal's favor to secure the note. Given the fact that after the buyout

---

**7.** Neither of these two issues regarding fraudulent conveyances were raised by defendant by way of motion. Instead, defendant, in its Motion to Dismiss, relied on the argument that while plaintiff might have a fraudulent conveyance claim under state law for which it could get relief in state court, it had no standing under Article III of the United States Constitution to bring the matter in federal court. The court

rejected defendant's argument as meritless. "The law of [constitutional] standing is almost exclusively concerned with such public law questions as determination of constitutionality and review of administrative or other governmental action.... It is only where the question is of a public nature that the interested bystander is likely to attempt suit." C. Wright, *Law of Federal Courts* § 13.

TRAC had little cash, few assets, and retained earnings of only $21, the $1.2 million obligation to Federal was, for all practical purposes, Crescent's alone. Exhibit 144. Stripped of the formalities of the transaction (*i.e.* the note secured by the Deed of Trust) Crescent, in effect, transferred $1.2 million in equity, with a present value of $900,000, to Federal as a result of the buyout. *Cf. Gleneagles*, 565 F.Supp. at 574 (examining collateral for loan obligations). It is this transfer that is alleged to be a fraudulent conveyance.

To set aside a conveyance as fraudulent, Section 5 requires proof of two facts: (1) that the transfer was without fair consideration, and (2) that the transferor was left with unreasonably small capital. The text of the provision reads:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who became creditors during the continuance of such business or transaction without regard to actual intent.

Cal.Civil Code § 3439.05.

### 1. Fair Consideration

The Uniform Fraudulent Conveyance Act defines the term "fair consideration" in Section 3:

> Fair consideration is given for property, or obligation:
> (a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property, or obligation obtained.

Cal.Civil Code § 3439.03. Simply put, the question is whether Crescent received anything of value when it gave $900,000 to Federal. The answer is no. This is probably the case in every leveraged buyout.[8] Federal argues that Crescent did receive fair consideration for the $900,000 transfer—the services of Crescent's management, the $7.5 million GECC loan, and the $189,000 from TRAC.

■ Crescent's management's services were not fair consideration as a factual matter because Federal did not own those services so they were not Federal's to give in exchange for the $900,000. Additionally, there was no evidence that the services were worth that much even if Federal did own them. As a matter of law, management services do not constitute fair consideration when they have no identifiable monetary value. *Gleneagles*, 565 F.Supp. at 576.

■ With respect to the $7.5 million GECC loan, there is no evidence it was made "in exchange for" the $900,000 transfer to Federal. Even if it had been, a secured loan at market interest rates simply is not worth $900,000.[9] There is no basis for finding that the GECC loan was "fair consideration" for the $900,000 transfer to Federal.

■ With respect to the $189,000 loan, it stands to reason that if a $7.5 million loan is not fair consideration, neither is a $189,000 loan. But, there are differences between the two loans. The $189,000 loan was from TRAC and the evidence showed that Crescent would not have received this loan from TRAC if the $1.2 million debt to Federal that TRAC incurred had not been secured by Crescent's warehouse. So, in fact, the $189,000 loan, unlike the $7.5 million loan, was "in exchange for" the $900,000 transfer to Federal. However, the court finds the $189,000 loan was not a

---

8. Baird & Jackson, *supra* at 851.

9. The $900,000 would amount to a 12 percent origination fee on a $7.5 million loan, if it were paid to the lender (GECC). Here it was paid to an unrelated third party (Federal).

loan to Crescent at all, as TRAC never required Crescent to pay it back.[10] The $189,000 was effectively a capital contribution to Crescent. Despite the above findings, $189,000 simply is not the fair equivalent of $900,000 and cannot be considered "fair consideration" for the $900,000 transfer to Federal.[11] Federal had the opportunity at trial to offer evidence refuting plaintiff's evidence that whatever Crescent got as a result of the buyout, it was not worth anywhere near the $900,000 it gave Federal. Federal failed to produce such evidence. Plaintiff proved by a preponderance of the evidence that Crescent did not receive fair consideration for its signature on the note and the lien on its warehouse amounting to a transfer to Federal of $900,000.

## 2. Unreasonably Small Capital

Whether Crescent was undercapitalized as a result of the buyout is "a question of fact that must be ascertained on a case by case basis." *Wells Fargo Bank v. Desert View Building Supplies, Inc.,* 475 F.Supp. 693 (D.Nev.1978) *aff'd* 633 F.2d 225 (9th Cir.1980). Although the case law is not completely clear, the court assumes the burden of proof is on Federal to prove that Crescent was not left with unreasonably small capital because of the transfer. *Neumeyer v. Crown Funding Corp.,* 56 Cal. App.3d 178, 188, 128 Cal.Rptr. 366, 372 (1976); *Kirkland v. Risso,* 98 Cal.App.3d 971, 978, 159 Cal.Rptr. 798, 801–02 (1979); *Gleneagles,* 565 F.Supp. at 577.

Federal relies primarily on GECC's analysis of Crescent's cash flow and the testimony of GECC officials to prove that Crescent was not undercapitalized at the time of the buyout when GECC studied the company and decided to lend it $7.5 million. Federal also relies on the testimony of Crescent's top management personnel who invested their own money in the Crescent and believed in May of 1982 that it was a viable entity with sufficient capital to generate income to cover the debt service and make a profit. Plaintiff counters this evidence with the opinion of an expert witness that, compared to others in the wholesale food business and under a variety of measures of financial health, Crescent was undercapitalized. Plaintiff does not dispute that the GECC cash flow analysis predicted that Crescent would have sufficient funds to carry on its operations but plaintiff contends that the underlying assumptions of the GECC analysis were wrong.

After considering the evidence, the court is persuaded by the GECC analysis and a review of Crescent's balance sheet that Crescent was not undercapitalized at the time of the buyout.

The testimony of GECC's manager for the Western Region, Stephen Read, is especially probative. Read testified that GECC only finances five percent of the leveraged buyouts it considers and that the projected cash flow of the company is among the most important factors they consider. Read further testified that although the assets of the borrower are an important consideration since the loan is secured, cash flow is more important, since without the cash flow to service the debt, the loan would not be made. Read testified that Crescent's assets (*e.g.* accounts receivable and real estate) were considered in the making of the Crescent loan, but it was the projected cash flow that was the determi-

**10.** Federal actually contends the $189,000 was effectively paid back to TRAC because TRAC forgave the $189,000 debt in exchange for Crescent's payment of the debt service on the note. Consistent with the court's earlier finding that TRAC was a company with very little cash and few assets and that the note was in fact solely Crescent's obligation, the $189,000 should be treated as a capital contribution to Crescent.

**11.** There is one issue the court need not reach. Plaintiff in its papers responds to the argument that TRAC and Crescent were alter egos and that therefore Crescent/TRAC as a combined entity received all the stock in Crescent in exchange for the $900,000. Plaintiff argues that this amounts to a stock redemption by Crescent which as a matter of law does not amount to consideration. *Plaintiff's Memorandum* at 18. Defendant neither argued nor proved alter ego at trial. Therefore, this court need not consider plaintiff's response to the alter ego argument.

native factor in deciding to make the loan. In sum, based on its analysis of Crescent as evidenced by its internal reports, the buyout "made sense" to GECC as they fully expected the cash flow to be sufficient to service the debt. GECC projected a positive monthly cash flow of $69,000 to $885,000 a month for the year following the buyout.

GECC examined Crescent's financial health again in July of 1982 and again determined that Crescent was adequately capitalized and had sufficient cash flow to service the debt though its projections on future cash flow were more pessimistic. Based on this second analysis, which took place after the buyout, GECC agreed in November to lend another $2.5 million to Crescent for a total secured line of credit of $10.0 million. The court finds, based on the testimony of the GECC employees and the reports done by GECC both before and after the buyout, that Crescent, though heavily in debt, was not undercapitalized and had sufficient expected cash flow to stay in business.

Plaintiff argues that the court should reduce the weight that is placed on the evidence presented by the GECC witnesses because of incorrect assumptions contained in the GECC reports. Plaintiff's expert witness, economics professor and consultant Michael Tennenbaum, challenges four projections made by GECC: (1) the sales forecast; (2) the gross profit margin; (3) inventory turnover; and (4) the average age of accounts receivable. While the court found Tennenbaum qualified as an expert witness on financial matters, the court notes for the record that Tennenbaum does not have any particular expertise in analyzing the wholesale food business.

### a. Projected Sales

GECC forecast sales of $61 million for Crescent during the 12 months following the buyout. Tennenbaum testified that based on Crescent's historical sales experience he would have predicted total sales ranging from $55 to $57 million—$4 million less than GECC projected. Actual Cres-

cent sales were $57 million. The question the court must decide is *not* whether GECC's projection was correct, for it clearly was not, but whether it was reasonable and prudent at the time it was made. The court finds that it was. The testimony of Crescent's president Stanley Teeple proved that the reason the projected sales figures were not met was because of two unforeseen events. Market Basket stores, a big customer of Crescent, shut down and Crescent was left with substantial excess inventory. Many of the products Crescent sold were perishable and had to be sold by a certain date and so Crescent had to sell the excess inventory at distress sale prices. Therefore, in addition to the ongoing loss of sales to a big customer, the closing of Market Basket stores created a surplus of product at Crescent which had a downward impact on prices generally for that period. The second event was the strike against Crescent in October through December of 1982. The Teamster's Union, which represented Crescent's drivers, struck and two other unions, representing Crescent warehousemen and administrative personnel, refused to cross the picket line. Teeple testified that the strike was "devastating" to Crescent. It occurred during Crescent's busy season. In addition to lost sales caused by the strike's disruptive effect on Crescent, Crescent's cost of operations went up due to the strike and a dozen Crescent trucks were either destroyed or damaged, apparently due to strike related violence.

Despite this testimony, plaintiff argued at trial that the strike had no impact on Crescent's sales. As proof plaintiff proved that during October through December 1981 Crescent had $15 million in sales while during the strike in October through December of 1982 plaintiff had $16.3 million in sales. These figures are accurate but they do not prove, as plaintiff contends, that the strike had no impact on sales. All these figures prove is that despite the strike Crescent was able to increase sales over the previous year. Teeple's testimony demonstrates that, but for the strike, Crescent's sales during that period would have been even higher than $16.3 million and the

annual sales of Crescent would have been closer to the $61 million projected by GECC. Crescent's annual sales had been increasing prior to the buyout and it was prudent to project that those increases would continue.

Based on the evidence presented the court finds the forecast of $61 million in sales was not unreasonable. The strike, the loss of Market Basket stores as a customer, as well as the downturn in the economy in 1982–83 discussed by plaintiff's expert, caused sales to fall $4 million below projected figures. These were not predictable events when the buyout occurred.

Moreover, Tennenbaum testified that he did not recompute the cash flow analysis using the lower sales figure of $57 million so there is no basis for this court to reach the conclusion that the lower sales figure had any impact whatsoever on Crescent's cash flow, let alone a negative one. With $57 million in sales, Crescent was a smaller company than GECC predicted. Smaller companies need less capital to operate, so it is conceivable that lower sales, given that the amount of capital remained constant, made Crescent a healthier company rather than one that was less well capitalized.

### b. Gross Profit Margins and Inventory Turnover

Plaintiff's expert testified that he disagreed with GECC's projections of Crescent's gross profit margin and inventory turnover. GECC forecast a gross profit margin of 17.8 percent and plaintiff's expert testified that that actual figure was between 17.5 and 18 percent. GECC forecast an inventory turnover of eight times a year and Crescent's actual inventory turnover was eight times a year. As the GECC projections were consistent with Crescent's actual operating results, there is no reason to reduce the weight the court places on the GECC analysis because of these projections.

### c. Accounts Receivable Collection Period

■ Plaintiff's expert's most effective attack on the GECC analysis concerns GECC's initial assumption that Crescent's accounts receivable, on average, would be collected 26 days after being billed. In the year preceding the buyout, the collection period ranged from 26 days to 34 days. In the seven months following the buyout, the collection period ranged from 34 to 43 days, generally on the lower side. The industry average, according to Tennenbaum, was 7 to 34 days.

GECC's projection of a 26-day collection period was not unreasonable. Crescent had achieved that level before and it was well within the industry range. Crescent's main customers were the largest supermarket chains in Southern California and it was reasonable to predict a faster collection period after the buyout due to better management and more effective collection procedures. However, the court finds that it was not prudent to project an average 26-day collection period given Crescent's history and the fact that many Crescent customers were billed "net 30." The court agrees with plaintiff's expert that a 30-day accounts receivable collection period was consistent with Crescent's historical experience and a prudent projection. GECC came close to recognizing this itself after the buyout in July 1982 when it reviewed its cash flow projections and changed the projected average collection period from 26 days to 29 days. Crescent's actual average was slightly more than 30, due in part to delays caused by the strike affecting administrative staff in November and December of 1982. But for the strike, the accounts receivable collection period would have been shorter.

Tennenbaum recomputed the GECC cash flow analysis assuming a 30-day accounts receivable collection period. Exhibit 152, Schedule III. The recomputation demonstrates the dramatic impact a four day increase in the collection period has on cash flows. A four day increase would mean that Crescent had to finance its $5 million in receivables for approximately a fifteen percent longer period of time. Unlike

GECC's projected positive cash flow of $69,000 to $885,000 at the end of each month using a 26-day collection period, the Tennenbaum analysis of the same numbers with a 30-day collection period showed cash flows ranging from a negative $871,000 to a positive $297,000 at the end of each month completing the year after the buy-out with a projected $53,000 cash surplus in April 1983.

Despite the positive cash flow at the end of the year, and because of the projected one month deficit of $871,000, Tennenbaum concluded Crescent needed an additional $871,000 capital to operate assuming an average 30-day collection period. Tennenbaum also concluded that Crescent did not have "the reasonable prospect of being able to encumber sufficient assets to be able to borrow an additional $870,000 over and above what it had already borrowed from GECC and Federal." Exhibit 152 at 23. Therefore Tennenbaum concluded Crescent was undercapitalized.

Tennenbaum's opinion follows from his oft stated belief that after the buyout, Crescent was fully encumbered and unable to borrow to cover short term cash needs. Tennenbaum states that after the buyout it would be "difficult if not impossible [for Crescent] to arrange additional financing" and the "over-leveraged condition of Crescent precluded any reasonable probability of being able to borrow substantial amounts." Exhibit 152 at 12, 14. The court does not reach the same conclusion as Tennenbaum because after the buyout GECC agreed to increase its line of credit to Crescent by $2.5 million. The GECC decision was made after a study of Crescent's cash flow in July of 1982 which took into account projections of lower sales and a longer period of accounts receivable. Exhibit 50. GECC examined numbers similar to those produced by Tennenbaum and agreed to lend the funds. There could be no stronger evidence that Crescent had access to additional borrowing than GECC's decision to increase the line of credit. Consequently, Crescent did have the ability to borrow to cover a one month shortfall of $871,000. The $871,000 projected deficit

would have been comprised largely of inventory and accounts receivable. Both were assets GECC was willing to loan funds against. Crescent's main cash flow problem, in Tennenbaum's analysis and in fact, was financing inventory and accounts receivable through the Thanksgiving-Christmas holiday season. After the holidays, Crescent would be back in the black. Tennenbaum's analysis showed Crescent with a $297,000 cash surplus in January when Crescent received payment for its holiday sales. In reviewing Tennenbaum's modifications of the GECC cash flow, it is clear that with the additional line of credit provided by GECC, Crescent had sufficient cash flow to pay its creditors and its debt service and keep operating. This was the conclusion of GECC in deciding to lend additional funds to Crescent and this is the conclusion of the court as well.

Plaintiff points to the fact that at the same time GECC extended the $2.5 million line of credit, GECC refused to extend a $350,000 term loan to Crescent. But GECC did extend a one month $100,000 loan to help finance inventory buildup for the peak season at Crescent. It was during that period, on October 13, 1985, that the strike disrupted Crescent's operations. Exhibit 56.

With 20–20 hindsight it is clear that Crescent's cash flows did not work out as projected by GECC. The strike in particular was a factor, hitting Crescent at the worst time of the year at a time when management clearly needed to be tending to arranging short-term financing, collecting accounts receivable and consolidating operations which was one of the efficiencies being implemented by the management. Instead, management was forced to worry about day-to-day operations, replacing striking workers, and maintaining the flow of business. The strike was a crippling blow from which Crescent never fully recovered according to the testimony received at trial.

■ As stated at the outset, the court's task in determining whether Crescent had

sufficient capital as evidenced by cash flow projections is not to examine what happened to Crescent, but whether the GECC projections, as modified, were prudent. The court finds that they were. GECC's analysis throughout, particularly the initial analysis of Crescent's business prospects in Exhibits 49A and 49C, convince the court that Crescent was not undercapitalized at the time of the buyout based on a review and an analysis of projected cash flows. Based on these projections, GECC was willing to lend substantial sums to Crescent both before and after the buyout. Plaintiff is correct (and it is obvious) that the projections were wrong and that Crescent had insufficient capital to withstand the strike and the other setbacks to Crescent's business. But the law does not require that companies be sufficiently well capitalized to withstand any and all setbacks to their business. The requirement is only that they not be left with "unreasonably small capital" at the time of the conveyance alleged as fraudulent. The cash flows prove that Crescent did have sufficient capital after the buyout to continue operating.

#### d. Crescent's Balance Sheet—Financial Ratios

Plaintiff's expert Tennenbaum examined a variety of financial ratios to show that Crescent was undercapitalized, though he concedes that because of increased reliance on leveraging, these traditional balance sheet ratios (*e.g.* debt/equity ratios) are less relevant today than they once were and that it is possible to overcome the negative conclusions of such ratios based on positive cash flow projections. Exhibit 157 at 7, 19.

The court does not rely on these ratios in reaching its decision. First, plaintiff's own expert concedes that the negative implication of ratios can be overcome by a positive cash flow analysis. This view is consistent with the court's reliance on cash flow analysis above. Second, the evidence at trial casts serious doubt on the numbers plaintiff's expert used to produce the financial ratios. As the court has already stat-

ed, the $189,000 "loan" from TRAC to Crescent was in fact a contribution to capital. This adjustment in the balance sheet alone, deleting the loan as a liability because it did not have to be repaid, nearly doubles the capitalization of the company on the balance sheet. Additionally, the balance sheet understated the fair market value of Crescent's assets. There was repeated evidence presented that the value of the warehouse, carried on Crescent's books at $900,000, was worth about twice that amount. Plaintiff's own expert offered an opinion that the warehouse was worth $1.8 million. The book value of other assets was similarly below fair market value. Also, Crescent held a valuable asset in a cheese license from the United States Department of Agriculture which allowed Crescent to import cheese. Such licenses cannot be transferred and therefore have no market value in the traditional sense, but it is clear from the testimony that TRAC considered both the warehouse and the cheese licenses major assets of Crescent when TRAC agreed to purchase the company for over $1.4 million. Plaintiff Credit Managers too has recognized the value of the licenses, continuing to operate them for the benefit of creditors. The licenses, if they could be sold, according to defendant's expert, would have a value of $300,000. Other estimates were as high as $500,000. Despite the fact that they cannot be sold, they do generate a stream of income for plaintiff as they did for Crescent and have some value when analyzing Crescent's assets.

The upward adjustment in Crescent's assets, as compared to values reflected in the balance sheet and the downward adjustment in Crescent's liabilities due to the recharacterization of the TRAC loan, significantly effect most of the financial ratios computed by plaintiff's expert. For this reason, these computations are not relied on by the court in reaching its decision that Crescent was not undercapitalized after the May 7, 1982 leveraged buyout.

■ For all the above reasons, the court concludes that Crescent was not left under-

capitalized after Crescent's stock was purchased by TRAC. This case presents the question of whether Crescent's former shareholder Federal was paid too much for Crescent's stock. Most of the case law examining leveraged buyouts examines the opposite question, whether shareholders, usually minority shareholders, were paid too little for their shares. *E.g. Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983). Though these are different questions, they both require an examination of the value of a company to determine how much shareholders should get for their shares. A fraudulent conveyance case, of course, also involves an examination of the equity the new owners put into the company. Perhaps the ultimate test is whether the buyout gives shareholders a fair price for their shares—not too much creating fraudulent conveyance and other problems, and not too little leaving shareholders undercompensated. *See* McCune and Van Kirk, "Leveraged Buyouts by Management," 16 *Rev. of Securities Regulation* No. 22 at 769 (December 22, 1983). TRAC's principals testified at trial, as did GECC officials, that the buyout made sense and the prospects for Crescent at the time of the buyout were very good. TRAC purchased for book value an established company with assets carried on the books at below market value. There was no evidence at trial that the price paid for Crescent was out of line with what it was worth. There was substantial evidence that the transaction being attacked as fraudulent was, in fact, a fair transaction as a result of arms length negotiations between the seller Federal and the purchaser TRAC at a time when other potential purchasers were also interested in the company. The court concludes that the transaction should not be set aside.

## V. UNLAWFUL DISTRIBUTION TO SHAREHOLDERS

Plaintiff's second claim is that the $10,-904.41 monthly debt service payments to Federal pursuant to the Note and the Deed of Trust were unlawful distributions to shareholders in violation of California Corporations Code §§ 500 and 501. *See* Baird & Jackson, *supra* at 852 n. 51.

■ California Corporations Code § 506 states both who may bring an action under §§ 500 and 501 and against whom they may bring it. It provides that shareholders who knowingly received prohibited distributions are "liable to the corporation for the benefit of all the creditors." Cal.Corp. Code § 506(a). However, § 506(b) provides, "Suit may be brought in the name of the corporation to enforce the liability [of shareholders to creditors for violation of §§ 500 and 501] *by any one or more creditors of the corporation whose debts or claims arose prior to the time of the distribution to shareholders.*" (emphasis added) Plaintiff Credit Managers is not a creditor of Crescent, it is an assignee for the benefit of creditors. Plaintiff argues that since creditors are the beneficiaries of the assignment to Credit Managers, Credit Managers may sue on their behalf. *Plaintiff's Memorandum* at 16, n. 10. Plaintiff's argument is not well taken. "In the absence of a statute conferring it, the assignee [Credit Managers] has no greater or better right of action than the assignor [Crescent] had or would have had if no assignment had been made." 6A C.J.S. Assign. Ben. Cred. § 106; *Smith v. Kirkpatrick*, 281 P. 616, 208 Cal. 417 (1929). Neither Crescent nor Credit Managers has a right of action under § 506. Only the creditors do.

By comparing the California fraudulent conveyance statute with the unlawful distribution to shareholders statute, it is clear that the legislature did not intend to give Credit Managers a right of action under § 506. The fraudulent conveyance statute begins by giving creditors a right of action. Cal.Civ.Code § 3439.09(a). It goes on to specifically provide a right of action for assignees of a general assignment for the benefit of creditors. Cal.Civ.Code § 3439.-09(b). Corporations Code § 506 contains no similar provision authorizing suits by assignees.

Even if the court were to consider the unlawful distribution claim, it would fail

for the reasons discussed below, and because of the value of Crescent's assets discussed *supra.*

## VI. PAYMENTS ON THE NOTE

 TRAC partially paid for Crescent's stock by executing a $1.2 million note in favor of Federal. Crescent signed the note and executed the Deed of Trust which placed a lien on the warehouse to secure the note. The court has concluded that the note and the lien were not fraudulent conveyances. Plaintiff also alleges that the monthly debt service payments on the note of $10,904.41 were fraudulent conveyances and, in addition, that these payments were unlawful distributions to shareholders. Plaintiff's arguments are not well taken. If the note and the lien are valid, so are the payments to reduce the amount of the note. The transfer to Federal can only be examined at the time Federal perfected its trust deed on the warehouse, May 7, 1982, not when the payments were made to reduce the note. *In re Madrid,* 725 F.2d 1197 (9th Cir.1984); *Cf. In re Greenbrook Carpet,* 722 F.2d 659 (11th Cir.1984). The fraudulent conveyance statute states that the creation of a lien is a "conveyance." Cal.Civ. Code § 3439.01. The payments on the note in this case merely reduce the amount of a valid lien. Finally, even if the court were to find the payments impermissible, the Deed of Trust would still be valid. *Matter of National Tile and Terrazo Co., Inc.,* 537 F.2d 329 (9th Cir.1976). As Federal's $1.2 million note is secured by the warehouse, voiding the payments to Federal would simply increase the amount of the lien, leaving the parties in the same position in which they are currently. The court notes, in addition, that plaintiff did not present evidence at trial as to who was a creditor at the date of each payment to Federal as required by California Corporations Code § 506(b).

## VII. EQUITABLE SUBORDINATION

Finally, plaintiff argues that the court should exercise its inherent equitable powers to subordinate Crescent's debt to Federal to Crescent's debts to its creditors. Consistent with the court's finding that the buyout was a valid and fair transaction and that Federal's Deed of Trust is valid, there is no equitable reason why Crescent's unsecured creditors should be favored over Federal, a secured creditor.

## VIII. CONCLUSION

For all the reasons discussed above, the court finds and holds that TRAC's purchase of Crescent's stock from Federal by means of a leveraged buyout was neither a fraudulent conveyance nor an unlawful distribution to shareholders. Let judgment be entered accordingly.