**In re Karen Grimmer BERGMAN,**
**Debtor.**

**John H. Ring III, as Chapter 7 Trustee**
**of the Estate of Karen Grimmer**
**Bergman, Plaintiff,**

v.

**Karen Grimmer Bergman and Roy**
**Bergman, Defendants.**

**Bankruptcy No. 01–12739K.**
**Adversary No. 02–1137K.**

United States Bankruptcy Court,
W.D. New York.

May 20, 2003.

John H. Ring III, Esq., Buffalo, NY, trustee/plaintiff.

Leonard Berkowitz, Esq., Berkowitz & Pace, Orchard Park, NY, for the defendants.

MICHAEL J. KAPLAN, Bankruptcy Judge.

This case provides a singular opportunity to lay to rest the old saw to the effect that under the Uniform Fraudulent Conveyances Act ("UFCA")[1] transferring one's interest in one's home to one's spouse before embarking in business is *always* a fraudulent transfer. We find that that is not true.[2]

What makes this case so useful is the fact that this Debtor's business could not have been opened without a $115,000 business loan by a bank, and she received this loan after full disclosure of the transfer of her interest in the marital home to her husband, and after the bank made a full analysis of her business plan. The bank found that despite the transfer, the Debtor's business would be properly capitalized by the $115,000, plus $25,000 that the Debtor's husband "loaned" her (to be repaid when, if ever, the business could af-

ford it), plus the bakery equipment that the Debtor had already bought and paid for.

In other words, a bank "loaned in" to the Debtor's start-up business in an amount that it believed would reasonably capitalize the business, and did so with full knowledge that the husband's participation to the extent of $25,000 was conditioned on her having transferred her interest in the home to him.

Coupled with the undisputed testimony that this business failed within two years because of overwhelming unexpected competition and other demographic factors, any finder of fact would be compelled to conclude that the Trustee/Plaintiff has failed to establish that the transfer of the interest in the home violated any provision of the Uniform Fraudulent Conveyances Act.

The case was tried February 6, 2003. The Court heard testimony from Karen Grimmer Bergman, Roy Bergman, Mark Luderman and Matthew Serwacki. The following constitutes the Court's findings of fact under Rule 52.

1. In the winter of 1998–1999, the Debtor, Karen Bergman, investigated the possibility of utilizing her more–than–20 years' experience in the bakery business by opening her own bakery. She had "many conversations" with "SCORE"—a volunteer organization of retired executives who help potential entrepreneurs to plan their business. Although the Debtor had purchased about $10,000 in bakery equipment, and had another $2,000 she could put toward the venture, a Mr. Aust-

---

1. This decision does not address the Uniform Fraudulent *Transfers* Act. The text of that 1984 proposal is different from the UFCA.

2. For a practitioner's perspective on "asset protection planning," see *John E. Sullivan, III, Future Creditors and Fraudulent transfers:*

*When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner,* 22 Del.J. Corp. L. 955 (1997).

rand from SCORE felt that the Debtor needed additional monies.

2. The Debtor's husband Roy Bergman said that he would put up $25,000 from his retirement savings, but only on the condition that he receive her interest in their marital home which was then worth about $125,000 and was unencumbered.

3. Roy Bergman was a law school graduate who never practiced law. He was able to prepare a deed to transfer her interest in the home, and also able to help his wife fill out the necessary forms to establish a Delaware corporation called "Sweet Surrender, Inc."

4. The deed was executed on May 12, 1999. The Debtor deposited the $25,000 that she received from her husband on June 30, 1999, and had executed, on June 26, 1999, a note to her husband for $25,000 with 6% interest.

5. The undisputed testimony of the Debtor and her husband is that the loan was to be repaid only if the business could afford it, and that this "investment" was the consideration paid in exchange for the Debtor having transferred her half interest in the home to her husband. However, the deed recited that the consideration was "$1.00 and no more."

6. The Debtor was the sole officer and director of the corporation. She developed the business plan in consultation with Mr. Austrand. The Debtor and her husband then met with Matt Serwacki of the New York State Business Development Commission, an entity that helps to put prospective small business owners and prospective lenders together; that group is made up of member banks. Mr. Serwacki examined the Debtor's very extensive business plan entitled "Sweet Surrender Patisserie and Boulangerie: Our Mission—to provide the best artisan, specialty breads and pastries in Western New York, accompanied with unparalleled customer service provided by a trained and dedicated staff." He testified that he was aware that the $25,000 seed money would be a loan from the Debtor's husband. He also testified that he knew that she had transferred her interest in the home to her husband, and that the home was now entirely her husband's.

7. Roy Bergman testified that the reason that he emphasized to Matt Serwacki and later to the bank officer named "Scott" that the $25,000 would not have been invested without her deeding her interest in the home to him, was that by virtue of his law school training he knew that this would be a "sensitive issue."

8. Mr. Serwacki of the NYSBDC arranged a group meeting with Scott at the Bank of Holland and recommended the approval of Sweet Surrender, Inc. for a loan of $115,000. The loan was extended 50% by the New York State BDC and 50% by the Bank of Holland. It was guaranteed to 75% by the SBA. There was a personal guaranty from Karen Bergman.

9. It was the testimony of Matthew Serwacki that Sweet Surrender, Inc. had adequate capitalization. It was also his testimony that the Bank knew about the transfer of the interest in the home, and that the $25,000 from the husband was a loan.[3]

10. The Debtor personally guaranteed a lease for the business location, and pledged the assets of the corporation on the business loan.

11. She opened her store in a suburban plaza in the summer of 1999. Shortly thereafter, construction started on a bank

---

**3.** The Trustee called a witness, Mark Luderman, who testified that the Bank's file was silent in all of these regards. Silence, however, is not contradiction, in this case.

in the plaza, which resulted in a loss of available parking space for her customers, and also made the surrounding area dirty and dusty. Then an anchor tenant in the plaza left; a departure which the Debtor estimates cost her 50% of her retail business. Then a regional chain of upscale breads and pastries, called "Montana Mills Breads," opened nearby. Then a new store for the dominant supermarket in this market, with an in-store bakery, was built nearby.

12. Sweet Surrender, Inc. ceased operation after Easter of 2001. Karen Bergman filed her Chapter 7 petition on May 2, 2001, scheduling $240,487.19 in debt. All debts were business debts except for a cell phone bill. Among the scheduled debt was Roy Bergman's claim for $25,000.

13. On May 20, 2002, the Chapter 7 Trustee commenced this Adversary Proceeding against the Bergmans seeking to set aside the transfer of the Debtor's interest in the marital home, claiming that the transfer was made wholly without consideration and with the intent on the part of the Debtor and her husband to hinder, delay and defraud the Bank and other creditors of the Debtor, and that the husband did not take the property interest "for value" and in "good faith," and that the conveyance was made and accepted knowing that the Debtor was going to enter into business, and knowing that the Debtor would incur business debts. He cites various provisions of the Uniform Fraudulent Conveyances Act as adopted in New York.

The parties have briefed the issues presented.

4. See cases collected at *Sullivan, supra*, note 2 at 1015 *et seq.*

5. *Id.* and see pp. 1040–1042.

## DISCUSSION

Of course, solvent persons who are not about to engage in business may freely gift their assets to whomever they please,[4] and those transfers do not become avoidable if the transferor later drives her car into a crowd of people. And the same is true even if the transferor had debts at the time of the transfer, so long as she reserved assets to meet existing and foreseeable obligations.[5]

However, the Uniform Fraudulent Conveyances Act (but *not* the Uniform Fraudulent Transfer Act) has been adopted in New York. Section 274 of the New York Debtor and Creditor Law states "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." (McKinney 2001).

▌ The test of "unreasonably small capital" is "reasonable foreseeability," tested by an objective standard anchored in projections of cash flow, sales, profit margins, and net profits and losses, including difficulties that are likely to arise. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073 (3rd Cir.1992), wherein it was also stated that "[B]usinesses fail for all sorts of reasons, and ... fraudulent conveyance laws are not a panacea for all such failures."(alteration in original) [6]

6. Quoting Markel, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L.Rev. 469 (1988). And see *Peltz v. Hatten*, 279 B.R. 710 (D.Del.2002).

■ As stated in *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Services Company,* 910 F.Supp. 913, 945 (S.D.N.Y.1995): "While a company must be adequately capitalized, it does not need resources sufficient to 'withstand any and all setbacks.'" (quoting *Credit Managers Ass'n of Southern California v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1986)). Rather, that court stated that "We know, with hindsight, that the forecasts were not realized. But 'the question the court must decide is *not* whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made.'" [7] *Id.* at 943 (quoting *Credit Managers*).

And that court paraphrased other authorities for the proposition that "the test is aimed at [transfers] that leave the transferor technically solvent, but doomed to fail." *Id.* at 944.

■ Perhaps recognizing these authorities, the Trustee did not premise this action on that provision of the Uniform Fraudulent Conveyances Act. However, the Court finds it useful to make it clear that those authorities establish beyond any doubt that the transfer in the case at bar did not leave the Debtor with unreasonably small capital. Three independent experts (the gentlemen from SCORE, the advisor from New York State Business Development Commission, and the loan officer from the bank) all found that the Debtor's business plan and projections were reasonable and should be met with the capitalization she had, including the bank loan.

That said, we must address the provisions of the Uniform Fraudulent Conveyance Act, upon which the complaint is premised. In this Court's view, the above coupled with disclosure of the transfer finding that capitalization was not unreasonable, establishes, without the need for more, that none of the other provisions of the UFCA can be brought to bear on this transaction.

■ Section 273 of the New York State Debtor and Creditor Law states "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." (McKinney 2001).

Assuming arguendo that there was no consideration at all, or that the $25,000 "loan" is not "fair consideration" for the transaction of the Debtor's interest in the marital residence, she was neither insolvent at the time of the transfer, nor rendered insolvent by the transfer. She was left with capital that was not unreasonably small, and as noted above, even undercapitalization may not be as dire as actual insolvency. Capitalization that is not "unreasonably small" has to mean a condition better than insolvency.

■ Next, § 275 of the New York Debtor and Creditor Law states "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." (McKinney 2001).

Again, the above dictum establishes that this was not the case. The Debtor and three independent analysts skilled in finance concluded that she would not be incurring debts beyond her ability to pay

---

**7.** Stated otherwise, "It is the intent to harm creditors, and not actual harm, that is central to determining fraudulent intent." *Sullivan, supra,* note 2 at 991.

586

as they mature. And those three analysts knew about the transfer. (For these purposes too the Court will assume for the sake of argument that the transfer was "without fair consideration.")

 Lastly, § 276 of the New York Debtor and Creditor Law states "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." (McKinney 2001).

It is most likely this provision that the old saw—that transfer of your assets to your spouse before entering upon business is always a fraudulent transfer—sought to address. But in the case at bar, an intent to defraud is conclusively negatived by the emphasis that both the transferor and the transferee placed on making full disclosure of that transfer to all three of the analysts consulted toward obtaining a bank loan that the Debtor fully intended and expected would be the only debt she would incur thereafter.[8] The cases are bereft of facts like these, and instead are full of transfers in the face of lawsuits, judgments, car crashes and other liabilities and risks of imminent liability.

## CONCLUSION

The Trustee justly cites the maxim that transfers among close family members without fair consideration are presumptively insolvent. That is probably what the old saw is intended to say. But the Court finds that the facts of the case at bar demonstrate precisely how that presumption may be fully and dispositively rebutted.

8. See *Sullivan, supra*, note 2, at 971, wherein, in discussing the UFTA rather than the UFCA, the author points out that the drafters of the UFTA stated that "the court may appropriately take into account all indicia negating as

The Clerk shall enter judgment dismissing the complaint on the merits, without costs to either side.

SO ORDERED.

well as suggesting fraud." Also, the UFTA provisions enumerating "badges of fraud" are analyzed for the proposition that "future creditors with notice have no basis to complain." *Id.* at 1030 *et seq.*