**Arnold L. KUPETZ, Trustee in
Bankruptcy of the Estate of
Wolf & Vine, Inc., Plaintiff,**

v.

**CONTINENTAL ILLINOIS NATIONAL
BANK AND TRUST COMPANY OF
CHICAGO, a national banking associa-
tion; Morris and Raviel Wolf, individu-
als; the Marmon Group, Inc., a Dela-
ware corporation; and David Adashek,
an individual, Defendants.**

No. CV 83–5174–ER.

United States District Court,
C.D. California.

Aug. 12, 1987.

, Thelen, Marrin, Johnson & Bridges, Robert B. Flaig, Paul A. Lax, Los Angeles, Cal., for Marmon Group, Inc.

Robert Louis Fisher, Michael H. Feldman, Barton, Klugman & Oetting, Levy & Norminton, Los Angeles, Cal., for Morris A. Wolf and Raviel Wolf.

Madison S. Spach, Jr., Levy & Norminton, Los Angeles, Cal., for Kupetz.

Sidley & Austin, Los Angeles, Cal., Charles G. Crosse IV, Herz, Levin, Eper, Sumner & Croysdale, S.C., Milwaukee, Wis., for Continental Bank.

## MEMORANDUM OPINION AND ORDER GRANTING DIRECTED VERDICT FOR DEFENDANTS

RAFEEDIE, District Judge.

This matter came on for trial October 21, 1986, the Honorable Edward Rafeedie presiding. A jury of six persons was duly impaneled and the case was tried from October 21 until October 24, 1986. Plaintiff Arnold L. Kupetz, Trustee in Bankruptcy of the Estate of Wolf & Vine, Inc., appeared by his attorneys, Levy & Norminton and Thomas M. Norminton and Douglas M. Waggaman; defendants Morris A. Wolf and Raviel R. Wolf appeared by their attorneys, Barton, Klugman & Oetting and Robert L. Fisher and Paul I. Wapner; and defendant The Marmon Group ("Marmon") appeared by its attorneys, Thelen, Marrin, Johnson & Bridges and Robert B. Flaig and Donald P. Johnson. All other parties were previously dismissed. This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334(b). Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1408.

Both oral and documentary evidence was introduced on behalf of the plaintiff. At the conclusion of the plaintiff's case, the defendants moved for a directed verdict under Fed.R.Civ.P. 50(a) as to all ten remaining claims for relief. The Court considered the papers and pleading on file, the arguments of counsel, the evidence produced at trial, and the applicable law, and granted defendants' motion for a directed verdict on all remaining claims.

## INTRODUCTION

Plaintiff Arnold Kupetz is the duly appointed, qualified, and acting Trustee in Bankruptcy of the Estate of Wolf & Vine, Inc. Wolf & Vine was a manufacturer of mannequins and display forms used to display garments.

Defendants Morris and Raviel Wolf are husband and wife and both reside in Los Angeles, California. Prior to July 31, 1979, Morris Wolf owned 50% of the stock of Wolf & Vine. Marmon is a Delaware corporation with its principal place of business in Chicago, Illinois. Prior to July 31, 1979, Marmon owned 50% of the stock of Wolf & Vine.

On July 31, 1979, Morris Wolf and Marmon sold their shares of Wolf & Vine to Little Red Riding Hood, a Wisconsin corporation formed by David Adashek, for the purpose of purchasing Wolf & Vine. Little Red Riding Hood agreed to purchase the shares in Wolf & Vine from Marmon and Mr. Wolf for $3,000,000. Pursuant to the Agreement of Purchase and Sale, Little Red Riding Hood was obligated to make a cash down payment of $1,100,000 at the time of the purchase and to make the remaining payments over the following four years. The remaining payments were secured by irrevocable letters of credit issued by the Continental Illinois National Bank

and Trust Company of Chicago ("Continental Illinois").[1]

David Adashek is an individual residing in Milwaukee, Wisconsin. He is a Certified Public Accountant, and a registered securities dealer licensed by the National Association of Security Dealers. In 1979, he owned numerous businesses, and was a successful Milwaukee businessman and real estate developer.

On December 23, 1981, two and a half years after the sale, Wolf & Vine filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. This petition was converted to a Chapter 7 liquidation proceeding by order of the Bankruptcy Court on January 18, 1982. Wolf & Vine is the debtor in proceedings under Chapter 7 now pending before the United States Bankruptcy Court, Central District of California, listed as case No. LA 81–17218–RM.

Plaintiff, as the Trustee, filed this action seeking to set aside payments made to Wolf and Marmon, for the purchase of Wolf & Vine and to bring back to the Estate the approximately $3,000,000 paid to Wolf and Marmon.

Plaintiff challenges the payments made to defendants and seeks to set aside the purchase by arguing (i) that the payments were fraudulent conveyances under various provisions of the Uniform Fraudulent Conveyance Act, California Civil Code §§ 3439.-05–07, and/or under various provisions of the Bankruptcy Act, 11 U.S.C. § 548; (ii) that as shareholders the Wolfs and Marmon breached their duty of good faith and fair dealing owed to the corporation and its creditors, and (iii) that the defendants conspired to commit fraudulent conveyances and to breach their fiduciary duties to the corporation and its creditors.

## FACTUAL BACKGROUND

In 1945, Morris Wolf and David Vine became partners and formed Wolf & Vine for the purpose of designing, manufacturing, and marketing plastic mannequins for the display of clothing.

At the time that Wolf & Vine was founded, the mannequin industry was dominated by a product made out of paper-mache. In addition to other shortcomings, the paper-mache mannequins were fragile and easily chipped and broke. Wolf determined that by utilizing plastic he could produce a mannequin which would be more durable and flexible than the paper-mache mannequins. Wolf also realized that he could design a product with removable plastic limbs, thus further enhancing the usefulness of a plastic mannequin.

The research and development progressed very slowly draining Wolf & Vine's capital resources by 1946. Wolf & Vine sold stock and obtained investors to finance further development, but the investors, including David Vine, ultimately gave up and Morris Wolf continued in the business alone although the business maintained the Wolf & Vine name. By 1947, however, Wolf & Vine was able to produce and market a plastic mannequin.

Over the next 20 years Wolf & Vine enjoyed great success in the industry and became a leading manufacturer of mannequins on the West Coast. Wolf & Vine mannequins were marketed primarily in the Los Angeles area, producing a "relaxed" style of mannequin well-suited to the sportswear garment industry which predominated in Southern California.

In 1969 the company relocated its operations to a 40,000 square foot industrial building which it purchased at 490 Bauchet Street in Los Angeles.

Morris Wolf also reached the age of 65 in 1969 and began to think about retiring. At around this time Robert Pritzker, President of Marmon, contacted Mr. Wolf. Marmon owned the Greneker Mannequin Company which produced high fashion mannequins sold primarily from New York showrooms and used mainly for high fashion displays in elite department stores such as Neimann-Marcus. Marmon was having difficulties managing Greneker and offered to sell the company to Wolf & Vine. Wolf informed Pritzker that he was contemplating

---

1. Adashek and Continental Illinois were former- ly defendants in this action.

selling his business and retiring and was not interested in purchasing Greneker.

At this point, Marmon, which was not interested in operating Greneker, offered to exchange the Greneker line for a 25% interest in Wolf & Vine. Moreover, Marmon pledged that if Mr. Wolf became incapacitated, died, retired, or decided to retire, Marmon would pay Wolf or his heirs book value for all his stock within 15 days of such event. Wolf accepted this proposal, and on November 13, 1970 Marmon obtain a 25% interest in Wolf & Vine in return for the Greneker line and the pledge to buy Mr. Wolf out should he decide to retire.[2]

In 1973, Marmon transferred the assets of its Darling Display Company to Wolf & Vine in exchange for an additional 25% of Wolf & Vine stock, making Marmon a 50% shareholder in Wolf & Vine. Mr. Wolf retained the right to sell his stock to Marmon for its book value should he decide to retire. The Darling Display Company mainly manufactured display forms used on department store counters to display garments such as neckties, socks, and shirts.

The combination of the Eastern high-fashion Greneker line with the casual look of the West Coast Wolf & Vine line gave the company the ability to compete successfully throughout the United States and made Wolf & Vine one of the leaders in the mannequin industry. The addition of the Darling Display line further enhanced the profitability of Wolf & Vine and the company prospered over the next several years.

In 1978, however, Morris Wolf reached the age of 73 and decided that he wanted to retire. Wolf informed Marmon of this and requested that Marmon buy his 50% interest in Wolf & Vine for its book value as per their agreement. Marmon concluded that Wolf & Vine was too small of a company to justify the management demands that Mr. Wolf's retirement would place on Marmon

executives and decided to seek a buyer to purchase the company.

Marmon located two potential buyers who discussed the company with Mr. Wolf, but neither of these buyers was acceptable. Around this time, Edward Simmons, an independent business broker located in Chicago, Illinois, introduced David Adashek to Robert Gluth, a Marmon representative. Adashek and Gluth held several meetings at Marmon headquarters in Chicago concerning Adashek's potential purchase of Wolf & Vine. In the Spring of 1979, Adashek flew out to Los Angeles and met with Morris Wolf. In May 1979 a letter agreement was reached whereby Marmon and Wolf agreed to sell their shares in Wolf & Vine to Adashek for $3,000,000. Continental Illinois issued a $100,000 letter of credit as an earnest money deposit, to be forfeited by Adashek if he, through no fault of his own, failed to complete the transaction by a certain date.

The final sales agreement was structured so that Marmon and Wolf sold their shares to Little Red Riding Hood. At the July 31, 1979 closing, Little Red Riding Hood made a cash down payment of $1,100,000 and executed promissory notes to the sellers for the remaining $1,900,000. These notes were to be paid in annual installments and were secured by letters of credit issued by Continental Illinois.

In a separate "simultaneous" transaction entered into on the same day, Adashek completed this transaction as a leveraged buyout. Continental Illinois agreed to provide the $1,100,000 used to make the down payment and the letters of credit guaranteeing the deferred purchase price in exchange for Adashek's and Little Red Riding Hood's (i) pledging security interests in the real and personal property of Wolf & Vine, (ii) pledging other assest controlled by Adashek,[3] and (iii) a *personal* guaranty

2. Prior to this transaction Mrs. Wolf had owned one share of Wolf & Vine stock. She surrendered her one share as part of this transaction and has not owned any shares of Wolf & Vine since November 13, 1970. After the acquisition in 1970, Wolf & Vine transferred Greneker's New York manufacturing operations to the Bau-

chet Street facility, but continued to operate its New York showroom and display facilities.

3. Adashek pledged the controlling shares of a company owned by him as well as delivering a mortgage on real estate owned by that company. At trial, Adashek testified that this real estate had a value in excess of $2,000,000.

executed by Adashek. At trial the evidence showed that Morris Wolf had no knowledge of this second transaction. Plaintiff failed to adduce any evidence suggesting that anyone at Marmon knew of the leveraged nature of the transaction.

At the time of the sale Wolf & Vine was a very prosperous company. It was a nationwide leader in the design, manufacture and sales of mannequins and had a strong reputation and solid customer list. As of June 30, 1979 Wolf & Vine had an unadjusted book value in excess of $2,700,000, but the evidence at trial revealed that this figure significantly underestimated Wolf & Vine's financial picture. The land and building owned by Wolf & Vine was carried on the corporation's books on June 30, 1979, together with office furniture and fixtures, plant machinery and equipment, autos and trucks at a net value after depreciation of $335,359. The land and building alone had been appraised at fair market values between $400,000 and $700,000 more than what was shown on the books, and David Adashek testified that he believed *these* appraisals undervalued the value of the land and property. Wolf & Vine owned valuable mannequin molds which were not shown as an asset to the business, and held patents which had a value of up to $100,000 in excess of the value carried on the Wolf & Vine's books on June 30, 1979.

On June 30, 1979 Wolf & Vine had cash on hand in excess of $540,000, accounts receivable in excess of $1,140,000, and pre-sold inventory valued in excess of $1,174,000. Moreover, Wolf & Vine sold almost all its products to major department stores and collected virtually all accounts receivable within 45 days. Wolf & Vine had a net income, before taxes, of over $808,000 for the first six months of 1979.

The evidence at trial established that $3,000,000 was, at minimum, a fair price for Wolf & Vine in July 1979. David Adashek testified repeatedly at trial that he believed the company was very undervalued at $3,000,000. Adashek stated that he estimated shareholder equity in Wolf & Vine at $3,260,000 as of December 31, 1979, and that he was not interested in a possible offer that had been relayed to him by Edward Simmons of $4,200,000 in exchange for stock in Wolf & Vine after Adashek acquired the company. Adashek testified that he was not interested in this offer because he bought Wolf & Vine for an investment and "was interested in building the company and developing the business."

Shortly after the closing, Adashek traveled to Los Angeles and became active in the affairs of Wolf & Vine. Morris Wolf remained President of the company during August 1979, but Adashek removed Wolf as a director and a signatory on the corporation's bank accounts, and omitted him from meetings with company personnel. Wolf and Adashek had several arguments concerning the manner in which the business was being run in the first few months after the sale. On approximately September 6, 1979 the two had another argument. Adashek took issue with Wolf's criticisms and told Wolf that he was just angry because he sold the company "too cheap." This confrontation led to Morris Wolf's resignation from Wolf & Vine on that day.

After obtaining control of Wolf & Vine, Adashek began implementing a number of changes in the way the business was operated. He increased salaries to all employees, expanded the advertising budget, enlarged marketing and merchandising expenditures, replaced certain personnel, and actively attempted to increase sales and profits. Adashek delegated most of the day-to-day operations to his controller and vice president of sales, who reported to him in Wisconsin by telephone on a regular basis. Adashek regularly visited the Los Angeles facility and attended trade shows in New York and San Francisco, but was essentially an absentee owner.

Although revenues increased slightly in 1980, the company incurred an after tax loss of $286,000 largely due to the increase in operating expenses undertaken at Adashek's initiative. During 1981, Adashek remained active in the management of Wolf & Vine: the company brought on new lines of mannequins and explored the fea-

sibility of expansion into the European market.

In April 1981, Continental Illinois issued a new $3,500,000 line of credit to Wolf & Vine. This credit was provided, in part, to pay off the remaining indebtedness owed to Marmon and Wolf. Prior to extending this credit, Continental Illinois had a member of its staff conduct an audit into Wolf & Vine. In July 1981 the full outstanding principal balance of approximately $1,600,000 was paid to Marmon and Wolf. All that remained owing to Marmon and Wolf was accrued interest under the notes. In December 1981, faced with continuing high expenses, lower than anticipated sales, and the refusal of Continental Illinois to extend further credit, Wolf & Vine filed for relief under Chapter 11.

### FRAUDULENT CONVEYANCE

Plaintiff is attempting to set aside the payments made to Marmon and Wolf by applying the law of fraudulent conveyances to a leveraged buyout. This Court has previously addressed the problems endemic in attempting to apply "a law with its origins in 16th Century England to a financial transaction which did not exist on a large scale until the 1980s." *Credit Managers Ass'n of Southern California v. Federal Co.*, 629 F.Supp. 175, 179 (C.D.Cal.1985) (footnote omitted). As *Credit Managers* notes, there are a number of threshold issues relating to the application of the law of fraudulent conveyances to leveraged buyouts.

> Extending fraudulent conveyance law beyond preventing sham transactions and gratuitous transfers by insolvents is a step that should be taken only with caution.... An important conceptual question is whether a leveraged buyout in fact presents fraudulent conveyance problems.

Baird & Jackson "Fraudulent Conveyance Law and Its Proper Domain," 38 *Vand.L. Rev.*, 829, 840, 852 (1985).

The Court previously decided that all claims of presently existing creditors arose after the time of sale on July 31, 1979. It is not clear that the creditors whose claims arose after the sale of Wolf & Vine should be able to set aside the sale. The evidence showed that the sale of Wolf & Vine was advertised in the trade journals and known throughout the industry. As *Credit Managers* states,

> It would seem that if leveraged buyouts are to be susceptible to attack on fraudulent conveyance grounds, only those who were creditors at the time of the transaction should have a right to attack the transaction.... If there is no limit on when a creditor can sue to set aside a transfer, fraudulent conveyance law becomes an insurance policy for creditors of companies....

629 F.Supp. at 180–81.

Given the circumstances of this transaction and the fact that the bankruptcy petition was filed two and a half years after the transaction, the Court entertains serious doubts as to the appropriateness of the use of the fraudulent conveyance law to attempt to set aside the sale or the payments made to the purchasers more than one year prior to the bankruptcy. It is not clear to the Court why the trustee should be able to use the fraudulent conveyance laws to reach back and attack payments made in 1979 and 1980 while under the Bankruptcy Law, 11 U.S.C. § 548, he may only challenge payments made within one year of the filing of the petition on December 23, 1981.

Nonetheless, "the important questions of whether fraudulent conveyance law is generally and broadly applicable to leveraged buyouts and whether, if it is, creditors challenging the transaction must be creditors at the time of the transaction," *Credit Managers*, 629 F.Supp. at 181, remain unanswered. Because of the unique procedural background of this case,[4] these issues were not presented to this Court and will

---

**4.** This case was transferred to this court shortly before trial. Motions for summary judgment had been filed before and decided by another Judge. Prior to the trial of this matter, this Court invited motions to resolve certain issues that had *not* been decided previously, but informed counsel that this Court would not entertain motions on issues previously submitted and decided in the action.

not be ruled on at this time.[5] Instead the Court assumes that the fraudulent conveyance laws apply to this leveraged buyout. *Credit Managers*, 629 F.Supp. at 179.

■ In this case there is a more fundamentally troubling problem posed by plaintiff's attempt to use the fraudulent conveyance laws to recover money from Marmon and Wolf than was posed in *Credit Managers*. Marmon and Wolf sold a prosperous company for a fair price to an independent and wealthy purchaser who had a strong relationship with a major financial institution. Marmon and Wolf received $3 million for a company that was worth at least $3 million. In return for the purchase price, Marmon and Wolf parted with a company that was worth at least $3 million. Even had the sellers known of the method of financing arranged by the buyers, this was an entirely fair transaction from the seller's perspective. In the Court's view it is an unwarranted extension of the fraudulent conveyance laws, or any laws, to attempt to deprive Wolf and Marmon of the fair value they received in exchange for their business. To hold the sellers responsible for the buyer's actions in raising the capital for this transaction, especially where the sellers did not know of these arrangements, is thoroughly inappropriate and inequitable. The sellers had nothing to do with the financial structuring of the purchase worked out by Adashek and should not be held responsible for any damage this financing caused later acquired creditors of Wolf & Vine.

In reaching the conclusions that it has in this case, the Court could not help but be influenced by the injustice which would result if the relief sought by the Trustee were granted. Nowhere is this more evi-dent than when considering the particularly devastating affect on Morris and Raviel Wolf who spent a lifetime building the business to a position of preeminence in the industry, and then, sold this prosperous business for a fair price, intending to retire on the proceeds of the sale. It is wholly inappropriate to have creditors, who became creditors after the fact, ask this Court to order the Wolfs to surrender their purchase money to the creditors, thus leaving the Wolfs without their company and without the money that they were paid to sell it. Ironically, the creditors make this request without demonstrating to the Court that before extending credit to Wolf & Vine, they made any investigation whatever to determine its financial condition or its credit worthiness, which was well within their right to do. Having failed to make any such investigation or having done so inadequately, the creditors now ask this Court to order the Wolfs to indemnify them against losses resulting from improvidently granted credit. Not only is this unpalatable, but the Court believes, it is legally and equitably untenable.

Plaintiff alleges that the payments made, and obligations incurred to Marmon and Wolf by Little Red Riding Hood and Wolf & Vine as a result of the sale violated California Civil Code §§ 3439.05, 3439.06, and 3439.07 (hereinafter referred to as "Section 5, 6, or 7 of the Uniform Fraudulent Conveyance Act" or "Section 5, 6, or 7"), as well as various provisions of the Bankruptcy Code which prohibit fraudulent transfers.[6]

### Section 5

Section 5 of the Uniform Fraudulent Conveyance Act provides:

---

**5.** *Credit Managers* remains one of the sole reported decisions discussing the application of the fraudulent conveyance laws to leveraged buyouts. The only decision that this Court has seen decided subsequent to *Credit Managers* is the Third Circuit Court of Appeals' ruling on the trilogy of *"Gleneagles"* cases. *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3rd Cir.1986). *Tabor* held that the fraudulent conveyance laws applied to a challenged leverage buyout where there was an "intentionally fraudulent conveyance." 803 F.2d at 1297, n. 3. *Tabor* does not answer the broader questions posed by Baird and Jackson of whether fraudulent conveyance laws should be applied to buyouts entered in the ordinary course.

**6.** Plaintiff also brought claims seeking to set aside the transaction as a fraudulent conveyance under Cal.Civ.Code § 3439.04 and as improper distributions under Cal.Corp.Code § 506. The Court previously ruled that summary judgment was appropriate on these claims. (See Court's Order of August 13).

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to actual intent.

Cal.Civil Code § 3439.05.

### 1. Fair Consideration

Section 3 of the Uniform Fraudulent Conveyance Act defines the term "fair consideration":

Fair consideration is given for property, or obligation:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disportionately small as compared with the value of the property, or obligation obtained.

Cal.Civil Code § 3439.03.

In *Credit Managers* this Court opined that a corporation whose stock was acquired by way of a leveraged buyout probably never received fair consideration. 629 F.Supp. at 182. *Credit Managers* involved a sale by the Federal Company ("Federal") of the stock in Crescent Food Company ("Crescent") to Teeple-Reizer Acquisition Company ("TRAC") an entity comprised of Crescent's top management. TRAC financed its purchase by borrowing against Crescent's assets and executing a promissory note in favor of Federal. Crescent also executed a trust deed as security for the promissory note in favor of Federal which gave Federal a lien on Crescent's warehouse. Crescent also agreed to pay off intercompany debt owed to Federal.

The circumstances of the transaction in *Credit Managers* reveal a "classic" leveraged buyout scenario in which there possibly never can be fair consideration. But that type of situation is very different from the transaction in this case. Wolf and Marmon sold their stock in Wolf & Vine to Little Red Riding Hood with no knowledge that the transaction would be completed by Adashek as a leveraged buyout. No evidence at trial showed that Wolf or Marmon had any knowledge that Adashek had pledged the assets of Wolf & Vine to Continental Illinois as security for down payment and letters of credit.

From the seller's perspective this was a transaction in which they sold a company which was clearly worth at least $3 million to a wealthy buyer with strong ties to a major financial institution for $3 million. Given the circumstances of the sale one should focus on whether the sale of Wolf & Vine by Wolf and Marmon to Little Red Riding Hood was made for fair consideration. Clearly it was. The fact that Wolf & Vine may not have received fair consideration when Adashek pledged its assets to Continental Illinois or when Wolf & Vine made payments to the shareholders in 1980 and 1981 is not determinative because Wolf & Vine was not a party to the transaction with the sellers. The 1980 and 1981 payments were made to reduce an antecedent debt incurred by Little Red Riding Hood. The fact that Little Red Riding Hood provided Wolf & Vine with nothing of value when Wolf & Vine assumed this debt in a separate transaction does not mean that the plaintiff should be able to attack the payments received by Wolf and Marmon as a fraudulent conveyance. That was a fair transaction entered into for fair consideration.

### 2. Unreasonably Small Capital

Even if fair consideration had not been provided in the transaction, plaintiff's Section 5 claim fails because Wolf & Vine was not left with an unreasonably small capital as a result of the July 31, 1979 sale.

Plaintiff contends that if it establishes that the conveyance was made without fair consideration, defendants have the burden of proving that Wolf & Vine was not left with unreasonably small capital because of

the transfer citing *Credit Managers*, 629 F.Supp. at 183. In *Credit Managers*, the court assumed that the burden rested on defendants, but did not decide the issue. Although a directed verdict is appropriate regardless of whether the burden to prove undercapitalization rests with plaintiff or defendants, the Court believes that it is appropriate to address the burden of proof issue. *Credit Managers* did not *decide* that a selling shareholder bore the burden of proving that the corporation was not left undercapitalized as a result of the sale; the Court was not required to make such a decision based upon the facts of that case. Neither *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 128 Cal.Rptr. 366 (1976) disapproved on other grounds *sub nom Liodas v. Sahadi*, 19 Cal.3d 278, 137 Cal.Rptr. 635, 562 P.2d 316 (1977) nor *Kirland v. Risso*, 98 Cal.App.3d 971, 159 Cal. Rptr. 798 (1979) support the position that the burden of negating insolvency is always on the conveying party.

*Neumeyer* merely holds that it is sometimes appropriate to shift the burden of proof to defendant where the plaintiff establishes a *prima facie* case that a conveyance was made without fair consideration and the evidence reveals the conveyor had substantial liabilities at the time of the conveyance. Creditors in *Neumeyer* had made substantial and unsuccessful efforts to locate the extent of the conveyor's assets. Under such circumstances *Neumeyer* held a transfer without consideration is presumptively fraudulent and the conveyor must introduce evidence showing that the transfer did not leave the conveyor with unreasonably small capital.

The shifting of the burden approved by *Neumeyer* is not appropriate given the circumstances of this case, and plaintiff bears the burden of proving insolvency. *See Stearns v. Los Angeles City School District*, 244 Cal.App.2d 696, 737, 53 Cal.Rptr.

482, 509 (1966); *Neumeyer*, 56 Cal.App.3d at 180–190, 128 Cal.Rptr. 366.

■ Plaintiff failed to sustain this burden at trial. Plaintiff relied solely upon the testimony of John Shelton to support its contention that Wolf & Vine was left undercapitalized by the 1979 sale. Although Shelton testified that in his opinion the sale left Wolf & Vine with unreasonably small capital given the debt obligations it incurred after the July 31, 1979 transaction, plaintiff failed to establish a *prima facie* case of insolvency. Shelton's analysis of the solvency of Wolf & Vine was incomplete and ignored several important factors in order to arrive at the desired result. Moreover, Shelton made a number of assumptions which undermine the appropriateness of his findings. Shelton assumed that Wolf & Vine would retire the debt to Marmon and Wolf entirely within four years without attempting to restructure its loan agreement with Continental Illinois or without borrowing again. He did not consider Adashek's other assets and personal guaranty which were also used to secure and guaranty the indebtedness to Continental Illinois.[7] Furthermore Shelton's valuation of the assets and liabilities was flawed.

Shelton used questionable methods in appraising the solvency of Wolf & Vine after the sale. He maintained liabilities at their full value, but discounted assets, and discounted them without an understanding of their true value to Wolf & Vine or within the industry. Part of the problems inherent in Shelton's valuation of the assets resulted from his failure to research the business of Wolf & Vine, discuss the company with former employees or others in the industry, or learn about the mannequin industry. For instance, Wolf & Vine collected almost all of its accounts receivables within 45 days due to the size and financial

---

7. Shelton testified that he did not lend much credence to the valuation of Adashek's assets or in his personal guaranty. Continental Illinois, however, was better able to assess Adashek's financial stability, his net worth, and the importance and value of his personal guaranty. Adashek pledged these assets to secure the loans from Continental Illinois, and the Court believes the bank, interested in protecting its loans and letters of credit, was in a far better position to assess Adashek's net worth than Shelton who engaged in an evaluation after the fact. Notably, Shelton did not contact the bank before discounting the value of Adashek's assets and guarantee.

strength of its customers, yet Shelton valued receivables at 75% of their worth. He substantially undervalued Wolf & Vine's finished inventory and work in progress because he did not know that the company had presold most of its inventory and work in progress.

Many of these valuation problems arose because Shelton was told to value the company as it if were liquidated and each asset was sold apart from all other assets and not to value it as a going concern. Shelton's valuation of assets and liabilities suffered from other infirmities. He was instructed to assume a $175,000 liability to Wolf & Vine's pension plan, but this Court has previously ruled that this was not a liability at the time of the July 31, 1979 sale. He viewed the lease of Wolf & Vine's showroom as a liability; yet this lease might have been sold or been of value if Wolf & Vine was sold as a going concern: Shelton did not consider those possibilities. Similarly, consulting contracts with Morris Wolf and Edward Simmons were viewed as straight liabilities; whereas they would have had value if Shelton valued Wolf & Vine as a going concern. He undervalued the land and building owned by Wolf & Vine as well as the company's other assets.

Shelton readily conceded at trial that he is neither an expert in valuation nor a certified appraiser, and does not hold himself out to the public as an appraiser of assets. His lack of expertise in valuation techniques was apparent and undermines the worth of his opinion on insolvency.

Based on the foregoing, the Court is not persuaded that Shelton's testimony, or any other evidence at trial, established a *prima facie* case that Wolf & Vine was left with an unreasonably small capital as a result of Adashek's financing his transaction as a leveraged buyout. In any event, there certainly was no evidence that the sale from Marmon and Wolf to Little Red Riding Hood left Wolf & Vine with unreasonably small capital.

### Section 6

Section 6 of the Uniform Fraudulent Conveyance Act provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

Cal.Civil Code § 3439.06.

Section 6 would apply in this action to render the sale of Wolf & Vine as a fraudulent conveyance if the sale was made without fair consideration and if Wolf and Marmon intended or believed that Wolf & Vine would incur debts beyond its ability to pay them as they matured.

Plaintiff failed to present evidence making out a *prima facie* case for a Section 6 fraudulent conveyance. As noted above plaintiff failed to establish that the sale was without fair consideration. Moreover, there was no evidence indicating either an intent or belief that Wolf & Vine would not be able to pay its debts as they became due. At the time of the sale, Wolf & Vine had strong earnings, over $800,000 of cash reserves in the bank, valuable real estate and patents, and a firm list of solid customers who paid their bills in a timely fashion. There simply was no evidence that either Marmon nor Wolf had any intent to harm creditors to Wolf & Vine, rather the evidence revealed that Morris Wolf instituted the sale of the company he had built because he had quite naturally wanted to retire and enjoy the remaining years of his life. There was no evidence that either Wolf or Marmon knew of the leveraged nature of the transaction. After the sale, Morris Wolf remained at Wolf & Vine for a short period of time. He argued with David Adashek when Wolf saw Adashek make decisions that Wolf believed to be harmful to the business. It is difficult to see how one can argue that Wolf had any intent to harm the buyer, the company or future creditors.

The evidence also revealed that David Adashek had no such intent or belief, rather he believed that he was purchasing a strong company which he believed he could turn into an even more prosperous busi-

ness. Adashek bought a healthy company for a price that he felt was a "steal" and increased salaries, advertising, and marketing and merchandising expenditures in the hopes of dramatically increasing the business. There was no intent or belief that the company would incur debts beyond its ability to pay them as they matured. Instead, there was a strong desire to turn a prosperous company into a more prosperous company.

### Section 7

Section 7 of the Uniform Fraudulent Conveyance Act provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Cal.Civil Code § 3439.07.

Based upon the foregoing analysis it is clear that plaintiff failed to make out a *prima facie* case of a fraudulent conveyance under Section 7.

### CLAIMS UNDER THE BANKRUPTCY LAW

Plaintiff also brought several claims based upon the fraudulent conveyance provisions of the bankruptcy law. 11 U.S.C. § 548. For the most part these claims parallel those brought under the Uniform Fraudulent Conveyance Act, and directed verdicts were granted on these claims for similar reasons.

■ Claims under the bankruptcy laws may challenge only transfers made within one year of December 23, 1981, the date of the filing of the Chapter 11 petition. The trustee challenged two alleged transfers under these statutes: a payment of $798,-750 to Marmon made by Wolf & Vine on July 17, 1981, and a payment of $798,750 made to Morris Wolf on July 27, 1981. The latter payment was made by Continental Illinois pursuant to the letter of credit issued in 1979 securing payment of the purchase price.

The four bankruptcy claims brought by plaintiff emanate from specific provisions of 11 U.S.C. § 548. Broadly speaking § 548 allows the trustee to avoid "any *transfer* of an interest in the *debtor* in property, or any *obligation* incurred by the *debtor*, that was made or incurred on or within one year before the date of the filing of the petition ..." (emphasis supplied).

11 U.S.C. § 548(d)(1) explains:

> For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchase from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in the property transferred that is superior to the interest in such property of the transferee but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

The payment made by Continental Illinois to Morris Wolf on July 27, 1981 was not a transfer as that term is used in § 548 which requires a transfer by a *debtor*. The payment on the letter of credit to Wolf does not constitute a transfer of property of the estate under § 548.

> [T]he authorities are uniform that the payment of such funds [by virtue of a letter of credit] would not constitute a transfer of any property of the estate. On the contrary, any payment of such funds could only be classified as a transfer of Mercantile National Bank's property to the beneficiary of the letter of credit. *In Matter of Marine Distributors, Inc.*, 522 F.2d 791, 795 (9th Cir. 1975).

*In Re Originala Petroleum Corp.*, 39 B.R. 1003, 1014 (Bankr.N.D.Tex.1984) (footnote omitted). *See also In re M.J. Sales & Distributing Co., Inc.*, 25 B.R. 608 (Bankr. S.D.N.Y.1982); *Berman v. LeBeau Inter-America, Inc.*, 509 F.Supp. 156, 160–61 (S.D.N.Y.1981) *aff'd* 679 F.2d 872 (2d Cir. 1981).

Because the payment to Wolf in July 1981 is not a "transfer" under the provisions of § 548, that payment cannot be considered a fraudulent conveyance and Wolf is entitled to a directed verdict on all of the claims under 11 U.S.C. § 548.

■ For the purposes of this motion, the Court assumes that the payment made to Marmon on July 17, 1981 came from Wolf & Vine and was a transfer under § 548.[8] Nonetheless, the relevant date in assessing this transfer is July 31, 1979 when Continental Illinois issued irrevocable letters of credit guaranteeing the payments to Marmon. 11 U.S.C. § 548(d)(1). No party could have acquired an interest superior to Continental Illinois in the assets which secured the letter of credit; therefore, the "transfer" at issue occurred on July 31, 1979 when the letters of credit issued. The 1981 payment on the antecedent debt would not be the relevant transfer and consequently there was not a transfer within one year of the filing of the petition.

Such a conclusion is consistent with the holding of *In re Madrid*, 725 F.2d 1197 (9th Cir.) *cert. denied*, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984) and *Credit Managers*, 629 F.Supp. at 189. ("If the note and the lien were valid, so are the payments to reduce the amount of the note. The transfer to Federal [the seller] can only be examined at the time Federal perfected its trust deed on the warehouse ... not when the payments were made to reduce the note.")

Assuming that the trustee has standing to challenge the July 1981 payment to Marmon, he still failed to establish a *prima facie* case on any of the bankruptcy claims. The claims under § 548(a)(1) and § 548(a)(2)(A) and (a)(2)(B)(iii) require intent to harm the debtor or creditors of the company and parrallel sections 6 and 7 of the Uniform Fraudulent Conveyances Act. The claims under § 548(a)(2)(A) and 548(a)(2)(B)(i) and (ii) require that the debtor received less than a "reasonably equivalent value in exchange for the transfer" and was either left insolvent by the transfer, became insolvent as a result of the transfer, or was left with an unreasonably small capital to continue in its business. For the reasons discussed in the previous section, a directed verdict in defendant's favor is appropriate on all of the § 548 claims. There was no evidence of any intent of Marmon to harm or hinder Wolf & Vine or future creditors. Little Red Riding Hood received reasonably equivalent value for the purchase from Marmon, and the sale did not leave Wolf & Vine undercapitalized.

## REMAINING CLAIMS

■ Plaintiff also contends that Marmon and Wolf, as the directors and controlling shareholders of Wolf & Vine, breached their duties of good faith and fair dealing to Wolf & Vine and its creditors. In order to recover for such a claim plaintiff must show that defendants were aware of facts sufficient to awaken suspicion and put a prudent person on guard that the sale to David Adashek would harm the corporation by depleting it of substantial assets, and that although they possessed such facts, they failed to conduct a reasonable investigation of the buyer. Plaintiff must also demonstrate that had defendants conducted an investigation of Adashek they would have uncovered facts which would put a prudent person on guard that Adashek would deplete Wolf & Vine of its assets. Plaintiff also has to prove that Adashek did in fact deplete Wolf & Vine of its assets. *DeBaun v. First Western Bank & Trust Co.*, 46 Cal.App.2d 686, 120 Cal.Rptr. 354 (1975); *Doleman v. Meiji Mutual Life Ins. Co.*, 727 F.2d 1480 (9th Cir.1984).

Based on the evidence presented at trial, plaintiff did not make out a *prima facie* case that either Wolf or Marmon breached their fiduciary duties to Wolf & Vine or its creditors. It was reasonable and prudent for defendants to rely upon the apparent financial strength of Adashek and the fact that Continental Illinois was willing to ex-

---

**8.** The evidence at trial did not clearly establish whether the payment to Marmon was made under the letter of credit or was a direct payment by Wolf & Vine. If the payment had been by letter of credit then it was not a transfer under § 548 for the reasons discussed above.

tend him credit and guarantee payment of the purchase price by issuing the letters of credit. It is reasonable for a prudent business person, engaged in the sale of a privately held company for $3,000,000, to assume that a major bank would not extend credit to a buyer who did not have adequate collateral and a sound financial background. Marmon, and certainly Wolf, was justified in relying upon an investigation conducted by Continental Illinois—to hold that they were obligated to conduct an independent investigation, under the circumstances of this case, would be unreasonable.

Even had defendants conducted an independent investigation, this Court believes they would not have uncovered facts which would indicate that Adashek would harm Wolf & Vine after the purchase. An investigation would have revealed that Adashek was a successful businessman with personal assets of approximately $5,861,000 and a net worth of $5,381,508 as of May 31, 1979. Adashek intended to become personally involved in the operations of Wolf & Vine and sought to improve its business. All of the signs at the time of the purchase were positive and indicated that Adashek would certainly not deplete Wolf & Vine of its assets. A directed verdict in defendants' favor is warranted on the breach of fiduciary duty claim.

Plaintiff also sought relief based upon a claim that Wolf and Marmon conspired to make fraudulent conveyances and to breach fiduciary duties. There was no evidence presented on any conspiracy, and, especially in light of the above discussion, it is clear that a directed verdict is appropriate on this claim. Finally, in light of the foregoing, the Court grants judgment in defendants' favor on plaintiff's equitable subordination claim.

IT IS SO ORDERED.

The Court further orders the Clerk to serve copies of this Order on all parties by United States mail.