In re STRUCTURLITE PLASTICS CORPORATION, Debtor.

SPC PLASTICS CORPORATION and Official Unsecured Creditors' Committee of Structurlite Plastics Corporation, Plaintiffs,

v.

Robert E. GRIFFITH, et al., Defendants.

Bankruptcy No. 2–88–01236.
Adv. No. 2–90–0127.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Nov. 21, 1995.

James R. Cooper, Morrow, Gordon & Byrd, Newark, OH, for Defendants Robert E. and Helen E. Griffith and Charles D. and Geraldine W. Jones.

Reginald W. Jackson, Vorys, Sater, Seymour and Pease, Columbus, OH, for Debtor.

### OPINION AND ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court on the joint motion of SPC Plastics Corporation, formerly known as Structurlite Plastics Corporation, ("Debtor") and the Official Unsecured Creditors' Committee ("Committee"). The Debtor and the Committee, collectively referred to as the Plaintiffs, seek summary judgment on counts one, two and eleven of their complaint as those counts relate to Robert E. and Helen E. Griffith and Charles D. and Geraldine W. Jones ("Defendants"). The Defendants oppose the motion. The Court heard oral argument on this motion and on the Defendants' cross motion for summary judgment.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and the General Order of Reference entered in this district. This is a core matter which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(H), (B) & (O).

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy Rule 7056, provides in part:

> The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.... 

Fed.R.Civ.P. 56(c).

The fact that the parties have filed cross motions for summary judgment does not change the standards upon which courts must evaluate summary judgment motions. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991). Courts are required to resolve each motion on its own merits drawing all reasonable inferences against that party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987). Where there remain genuine issues of material fact, summary judgment is not proper for either side.

The counts against the Defendants for which the Plaintiffs seek summary judgment relate to the avoidance of certain transfers alleged to be fraudulent to creditors and the subordination of Defendants' claims against the estate for obligations undertaken in connection with those transfers, but yet unpaid, and any claim arising from this adversary action.

Many of the operative facts set forth below are not contested. Further uncontested facts are also contained in the discussions of the legal issues.

## I. *Factual Background*

The Debtor was incorporated in 1948 and operated for many years as a manufacturer of fiberglass parts for automobile and other industries. In that endeavor the Debtor operated a manufacturing facility in Hebron, Ohio and, until 1982, in Lebanon, Ohio. The Debtor also had a smaller packaging facility in Newark, Ohio. Defendant Robert Griffith was a founder and a 49% shareholder of the Debtor who formerly served as its President and Treasurer. Defendant Charles Jones was also a founder and 49% shareholder who formerly acted as chief executive officer of the Debtor. Another defendant, E. Clark Morrow, has already settled with the Plaintiffs in this adversary. Morrow owned the remaining two percent of the issued outstanding shares of the Debtor.

In June of 1986 a corporation known as GLL was formed for the purpose of purchasing the Debtor's outstanding shares in a leveraged buyout transaction ("LBO"). The owners of GLL are George L. Levy and Laurence M. Luke. Total capital paid into GLL by Levy or Luke at its incorporation on April 22, 1986 was $1,000.00. On that same date the Defendants, Morrow, GLL and the Debtor signed an agreement pursuant to which GLL was to acquire the outstanding shares of the Debtor. The acquisition price was $4,000,000 and the sale closed on June 6, 1986.

At the time the LBO sale closed, The Central Trust Company, now known as Bank One, N.A. ("Bank"), made three loans to the Debtor. One loan ("Mortgage Loan"), in the amount of $1,000,000, was a ten-year term loan at 12% interest for 3 years and at a rate tied to a comparable treasury bill plus four percent for the remainder of the term. Repayment of that note required monthly principal and interest payments of $16,252 and was secured by a mortgage against the Hebron facility.

The second loan ("Equipment Loan"), in the amount of $500,000, was a seven-year term loan at 10–½% interest for the first year and at a rate measured by a comparable treasury bill plus four percent for the remaining six years. Monthly payments for principal and interest were $8,430 and repayment was secured by Debtor's equipment and machinery. All but approximately $33,000 of the Equipment Loan proceeds went to pay off existing loans from Central Trust.

The third loan ("Revolver Loan") provided a revolving line of credit up to $750,000 for a one-year term at an interest rate of prime plus two percent. Repayment, secured by the Debtor's accounts receivable, was to be made monthly. All three loans were cross collateralized.

The $1,000,000 proceeds from the Mortgage Loan went from the Debtor to GLL as an unsecured, unguaranteed loan. GLL then paid out approximately $840,000 of that amount to the Defendants and $16,000–$17,000 to Morrow. Approximately $140,000 went to the broker who had arranged the purchase.

In addition to the $840,000, the Defendants received promissory notes from GLL in an aggregate principal amount of $3,000,000 for the remainder of the purchase price for their shares. These notes, payable over nine years at interest only, required $267,000 each year for two years from June 1, 1987. After that period, principal and interest were payable at $500,000 on June 1, 1989, $600,000 each year from June 1, 1990 through June 1, 1994, and a final payment of $713,000. The Debtor guaranteed GLL's notes to the Defendants and GLL pledged the Debtor's stock it now owned to the Defendants and Morrow to secure repayment of the notes.

GLL's owners, Luke and Levy, prepared financial projections for submission to the Bank to obtain loans for the Debtor in connection with the LBO. Those projections were never met and by the end of 1986, the Debtor's auditors were unable to give it a going concern opinion. On March 8, 1988 the Debtor filed a petition under Chapter 11 of the Bankruptcy Code. The Debtor's schedules at the time of that bankruptcy filing showed assets of $3,000,000 against liabilities of $7,000,000, including $1,166,000 in trade debt.

During the Debtor's bankruptcy, the Hebron plant has been sold for $2,300,000. The Debtor also assumed the lease for the Lebanon facility, exercised a purchase option and sold that facility for $1,181,000.

The Plaintiffs seek to recover the $840,000 paid to the Defendants as a fraudulent transfer under sections 4 and 5 of the Uniform Fraudulent Conveyance Act, in force in Ohio at the time of the Debtor's bankruptcy filing. The Plaintiffs also seek to annul the $3,000,-000 guarantee of the Debtor and to subordinate any claims of the Defendants arising from this guarantee and any repayment of the $840,000 to the estate which might result from this adversary action.

## II. The Fraudulent Transfer Claims Under Either § 4 or § 5 of the Uniform Fraudulent Conveyance Act (Former Ohio Rev.Code §§ 1336.04 or 1336.05)

### A. Fair Consideration

■ Constructive fraud under either former Ohio Rev.Code § 1336.04 or § 1336.05 requires a plaintiff to show that the conveyance complained of was made without fair consideration. Whether consideration in a transfer alleged to be fraudulent is "fair" must be viewed from the standpoint of the Debtor. Therefore, the fact that a third party received consideration probably is not generally relevant, absent a preexisting business relationship between the Debtor and that party which would result in measurable economic benefit to the Debtor. *Cf. Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991–93 (2d Cir.1981).

The series of transactions characterized here as the LBO produced, from the Debtor's viewpoint, merely a change in the identity of its shareholders. The sale was from the Defendants to GLL. The Debtor, however, loaned GLL the funds it needed to close the transaction and guaranteed payment of the remaining price. The issue is what consideration flowed to the Debtor and whether such consideration was "fair" within the meaning of the statute.

The Defendants argue that the Debtor received fair consideration for the $1,000,000 loan to GLL and the $3,000,000 guarantee because the Bank extended loans to the Debtor and the Debtor received new, younger management with capacity to develop its business.

■ The Court finds that the opportunity to incur debt is not "consideration" for purposes of the UFCA. *Murphy v. Meritor Savings Bank (In re O'Day Corp.),* 126 B.R. 370, 395 (Bankr.D.Mass.1991); *see also Moody v. Security Pacific Business Credit, Inc.,* 127 B.R. 958, 976 (W.D.Pa.1991), *aff'd,* 971 F.2d 1056 (3d Cir.1992). The Bank loans cannot serve as fair consideration for the obligations taken on by the Debtor in connection with the LBO.

■ The Court further finds that new management cannot, as a matter of law, be fair consideration under the facts of this case. *Credit Managers Ass'n v. Federal Co.,* 629 F.Supp. 175, 182 (C.D.Cal.1985); *U.S. v. Gleneagles Inv. Co.,* 565 F.Supp. 556, 576 (M.D.Pa.1983), *aff'd in part sub nom., U.S. v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Although Luke and Levy owned GLL and GLL now owned all outstanding shares of the Debtor, management of the Debtor received separate compensation from the Debtor for its management efforts. Accordingly, new management is not the consideration received by the Debtor against which adequacy or fairness of any consideration must be measured.

The Debtor received little or no consideration for the obligations it undertook in connection with the LBO. GLL infused little or no capital into the Debtor and Levy or Luke paid only $1,000 into GLL. The Debtor emerged from the series of transactions referred to as the LBO as a highly leveraged company with the prior holders of its equity interests essentially converted into creditors. Therefore, the Plaintiffs have shown, as a matter of law, as required by §§ 4 and 5 of the UFCA, a lack of fair consideration to the Debtor for the loan it made to GLL, the assets it pledged for that loan, the guarantee of GLL's debts it executed, and the additional liabilities it undertook.

## B. Plaintiffs' Claims Under Section 5 of the UFCA (Former Ohio Rev.Code § 1336.05) (Unreasonably Small Capital)

■ Former Ohio Rev.Code § 1336.05 stated:

Every conveyance made and every obligation incurred without fair consideration, when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Remedies under § 5 of the UFCA are available to creditors who extended credit after the LBO closing and were unpaid at the time of the Debtor's bankruptcy filing. It is uncontested that such creditors exist and that the Plaintiffs may pursue remedies under this statute if all elements are met.

Likewise, the Court previously has determined that the Debtor did not receive fair consideration for the undertakings it assumed in connection with the LBO. That element is, therefore, also satisfied.

The only element remaining is whether the loan it extended, the guarantee it undertook and the other liabilities and encumbrances it incurred caused the Debtor to be left with unreasonably small capital to continue in business. The Defendants assert that there are genuine issues of material facts disputed on this issue and it cannot properly be disposed of by summary judgment. The Plaintiffs argue, however, that the Court should find, as a matter of law, that the capital which remained with this Debtor after the LBO transactions was unreasonably small.

Existing case law is unclear what standard should be used to determine if a debtor has been left with unnecessarily small capital as the result of a transfer alleged to be fraudulent. Some courts have equated unreasonably small capital with insolvency. *See, e.g., Gleneagles*, 565 F.Supp. at 580; *Kupetz v. Continental Ill. Nat'l Bank & Trust Co.*, 77 B.R. 754, 761–63 (C.D.Cal.1987) *aff'd*, 845 F.2d 842 (9th Cir.1988). Some have held that the encumbrance of all assets is unreasonably small capital *per se*. *Diller v. Irving Trust Co. (In re College Chemists, Inc.)*, 62 F.2d 1058 (2d Cir.1933); *Pirrone v. Toboroff (In re Vaniman Int'l, Inc.)*, 22 B.R. 166, 186 (Bankr.E.D.N.Y.1982).

In other cases the issue has been defined as whether a debtor retains sufficient cash flow. *See, e.g., Moody*, 971 F.2d at 1071–75; *Credit Managers*, 629 F.Supp. at 183–87 (C.D.Cal.1985); *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 132–34 (Bankr.D.Mass.1992); and *Murphy*, 126 B.R. at 404–09. In this connection the reasonableness of the financial projections used to justify the LBO becomes an issue. Such an analysis may be limited to a reasonableness examination of those projections or forecasts only in the light of factors known at the time of the LBO, *see Credit Managers*, 629 F.Supp. at 183–87 and *Ferrari*, 148 B.R. at 132–34, or may also consider post-LBO performance as it impacts on the reasonableness of those projections, *see Moody*, 971 F.2d at 1071–75 and *Murphy*, 126 B.R. at 404–09.

The Plaintiffs argue that projections which bear little or no relation to pre-LBO performance are *per se* unreasonable and if the Debtor is also undercapitalized as a matter of fact, the unreasonably small capital element of section 5 of the UFCA has been met. The Court agrees with the Plaintiffs that if the projections were unreasonable, the Debtor was left with an unreasonably small capital even though it may not have exhausted its available line of credit. *See Moody*, 971 F.2d at 1072. The Court, however, must take issue with the Plaintiffs' argument that the projections in this case were unreasonable as a matter of law. Two of the cases that the Plaintiffs rely on involve decisions made only following a bench trial that the projections in those cases were unreasonable. *See Ferrari*, 148 B.R. at 105, 133; *Murphy*, 126 B.R. at 373, 404–07. In the third case cited, the court found the projections not to have been unreasonable after a bench trial, and this decision was upheld on appeal. *Moody*, 971 F.2d at 1062, 1073–75. Because the Court believes that a genuine issue of material fact

exists with respect to the reasonableness of the projections in this case at the time they were made, summary judgment in favor of the Plaintiffs on this claim would not be appropriate.

### C. Plaintiffs' Claims Under § 4 of the UFCA (Former Ohio Revised Code § 1336.04) (Proper Plaintiff and Insolvency Issues)

Former Section 1336.04 of the Ohio Revised Code stated:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

To prevail on an action pursuant to § 4 of the UFCA, the Plaintiffs must show the Debtor failed to receive fair consideration for the $840,000 it paid to the Defendants, the $3,000,000 guarantee it undertook and the security interests it granted in its assets. The Plaintiffs must further show that the Debtor was insolvent or was rendered insolvent by the LBO transactions. Remedies under section 4 of the UFCA inure only to a creditor at the time of the questioned transactions. Section 544(b) of 11 U.S.C. gives the Debtor avoidance powers only to the extent such a creditor also exists at the time of the bankruptcy filing.

#### 1. The Existence of a Proper Creditor

■ Section 4 of the UFCA refers only to "creditors" while the other constructive fraud provisions explicitly speak not only of "creditors", but also of persons which became creditors after the transactions complained of. Therefore, the right to a remedy under former § 1336.04 is generally believed to be available only to a creditor which was owed both at the time of the transfer and at the time the action is brought, or, for purposes of a trustee's avoidance powers under section 544(b) of the Bankruptcy Code, when the petition is filed.

Uncontested facts indicate that at least two creditors existed at the time of the LBO which were still creditors at the time of the Debtor's bankruptcy filing and the adversary initiation date. Those two creditors are owed for trade debts which have never been paid to zero between the time of the LBO closing and the bankruptcy filing or adversary initiation date. It appears, however, that the existing obligations to these creditors may not be for the same invoices as were unpaid at the time of the LBO closing, but arise from the same open account relationships. The legal issue appropriate for resolution in the context of summary judgment, therefore, is whether a debt to a trade creditor at the time of an LBO closing must be the identical debt existing at the time of the bankruptcy filing or whether it is only the creditor and account relationship which must be identical.

The Court finds that the position taken by Judge Schmetterer in *Aluminum Mills* is the correct resolution. *See Official Unsecured Creditors' Comm. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869 (Bankr.N.D.Ill.1991).

> Similarly, the Complaint here alleges that commercial relationships between trade creditors and Debtor were in place from the time of the LBO to the date of the bankruptcy petition. It was contemplated by the parties at the time of the LBO that Debtor would be incurring liability throughout that period. In other words, agreements for open accounts clearly were in place at the time of the LBO and continued until the time of the bankruptcy petition. Thus, it is alleged that debts which existed at the time of the bankruptcy filing were substantially the same debts as those which existed at the time of the LBO in that they arose from the same commercial relationships on the same accounts.

As discussed earlier, courts have reasoned that a creditor must be prejudiced by a transfer in order to challenge it, and that a creditor whose claim is paid off is simply not prejudiced by the transfer. *See Heartland*, 103 B.R. at 1016. For example, in *Credit Managers*, the court noted that the majority of creditors had made a post-LBO decision to extend credit on new terms to a new entity, and therefore had no right to attack the LBO as harmful to them. *Cred-*

*it Managers,* 629 F.Supp. at 180. In contrast, a typical trade account contemplates a revolving indebtedness even after payment without the execution of any new contract with new terms. Thus, the alleged trade creditors here could very well have been prejudiced by the LBO since their relationships with Debtor were in place prior to the LBO and allegedly continued without interruption until the bankruptcy filing.

*Aluminum Mills* at 890.

This finding means that the Plaintiffs, as the representatives of eligible trade creditors, have established their right, as a matter of law, to seek remedies pursuant to former Ohio Rev.Code § 1336.04.

### 2. *Fair Consideration*

The Court previously has found that the Debtor did not receive fair consideration for the debts it incurred in connection with the LBO. Accordingly, the Plaintiffs have proven this element of an action under former Ohio Rev.Code § 1336.04.

### 3. *Insolvency*

The issue remaining is whether the Debtor was insolvent at the time of the LBO or rendered insolvent thereby.

Section 2 of the UFCA, former Ohio Rev. Code § 1336.02, defined insolvency as follows:

> A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

Case law is not uniform as to the standard used to determine insolvency under the UFCA concept. Some courts have used a balance sheet analysis. *See, e.g., Murphy,* 126 B.R. at 397. Some courts have applied the tests for equitable insolvency. *See, e.g., Moody,* 971 F.2d at 1070. In Ohio at least one court of appeals has used a standard which goes beyond that for equitable insolvency. *Cellar Lumber Co. v. Holley,* 9 Ohio App.2d 288, 224 N.E.2d 360 (Franklin Cty, 1967).

The confusion with regard to the standard comes from uncertainty about the meaning of the statutory phrase "present fair saleable value" and about what liabilities are included as "existing debts." Specifically, are assets valued separately, at liquidation or at fair market value? Is going concern value appropriate for a corporate transferor? Are contingent obligations to be included as liabilities and does "probable liability" require an estimation process?

 Initially this Court finds that a conventional balance sheet analysis is not appropriate. The standard for insolvency under the UFCA goes beyond that concept. First, the value ascribed to an asset on a balance sheet in the case of a long established company is unrelated to its present fair saleable value. Second, a conventional balance sheet does not reflect liabilities in "probable" amounts. If any liabilities are contingent or are otherwise not required to be included in a balance sheet under GAAP standards, such liabilities may not even appear. Certain assets apparently also are not required to be shown.[1]

 Likewise, the statutory language in the UFCA does not call for an analysis which is identical to the commonly understood meaning of an equitable insolvency test. That concept has been defined as the inability to pay one's debts as they become due. J.F. Queenan, *The Collapsed Leveraged Buyout and the Trustee in Bankruptcy,* 11 Cardozo Law Rev. 1, 13, 18 (1989). This standard is not identical to the UFCA standard, however, because it is not the Debtor's ability to pay its debts immediately after the questioned transfers which the Court must evaluate. Rather, the Court must value the Debtor's assets, not limited by customary balance sheet concepts of inclusion or valuation method, and compare that value to an estimated total of all the Debtor's liabilities, whether such liabilities are included on a conventional balance sheet or not and whether such liabilities would become due at the time of the transfer or at some future date.

---

**1.** See Defendants' Memo in Opposition, pages 16–18, 32–39.

The UFCA standard for insolvency, therefore, calls for a modified balance sheet approach combined with an expanded equitable insolvency analysis. In essence, the insolvency test of the UFCA is easier for a plaintiff to show than equitable insolvency would be and is more inclusive than a balance sheet would be.

Having found that the UFCA standard for insolvency is different from either the "balance sheet" or "equitable insolvency" tests as often expressed, the Court still must determine how the "present fair saleable value" of the Debtor's assets should be determined and what liabilities are likely to have to be paid on known debts.

 The Court concludes that in the context of a stock-purchase LBO later challenged as a fraudulent conveyance, the assets should be valued on a going concern basis unless bankruptcy is "clearly imminent" on the date of the LBO. *Moody*, 971 F.2d at 1067. The fact that the Debtor continued in business for nearly two years after the LBO is a strong indicator that bankruptcy was not contemplated or clearly imminent at the time of the transaction. Therefore, the "present fair value" of the Debtor's "assets" was the going concern value presumably represented by the price negotiated for the shares. This finding assumes, however, a transaction between unrelated parties at arms length with no allegations that the negotiated price to the selling shareholders was artificially low. *Compare* Queenan at 15–16 (the best evidence of a going concern value immediately after an LBO is normally the price paid) *with Moody*, 971 F.2d at 1067 (although purchase price is highly probative, factors such as the parties' view of the price as a "bargain" or the selling shareholders' need to close the deal quickly may justify a different valuation).

In this case, the buying and selling parties are unrelated and there have been no allegations that the price was other than a negotiated one. Nor are there any indications that the parties viewed the purchase price as a bargain or that the selling shareholders needed to close the transaction quickly. The price agreed upon was $4,000,000. The Court, therefore, will presume that the present fair saleable value of the Debtor's assets, at the time of the LBO, was equal to the price of $4,000,000 negotiated for the stock transfer. That price is the highest value the Court can find for the Debtor's assets.

In a different situation, such as one where a debtor disposed of an assortment of assets not capable of valuation as a going concern, another method of valuation might be more appropriate. But in the context of this LBO, the $4,000,000 negotiated price is the best and highest indicator of the present fair saleable value of the target company's assets. "Present" in this sense refers to the time of the questioned transfers.

Continuing the analysis required under Section 2 of the UFCA, the Court correspondingly finds that the "amount required to pay probable liability" on "existing debts" in these circumstances is not the same as the total of liabilities shown on the Debtor's pre-LBO balance sheet. In this LBO, the Debtor paid out $1,000,000 by way of a loan to GLL from the Debtor's loan proceeds from the Bank. The Debtor had to repay the Bank with interest or permit the Bank's collateral to be liquidated. GLL could repay that loan to the Debtor only if the Debtor upstreamed earnings to GLL to permit it to repay. GLL had no other income and only minimal assets. Therefore, the receivable shown from GLL was not a meaningful asset of the Debtor's which could be added to the asset value. The only meaningful entry relating to this obligation is the Debtor's liability to the Bank for $1,000,000 plus interest.

In addition to the $1,000,000 loan from the Bank, plus interest, the Debtor guaranteed payment of the $3,000,000 balance owed to the selling shareholders. Since the primary obligor, GLL, was a shell corporation with no assets apart from the shares of the Debtor, funds to pay this balance also would have to come either by an upstream of the Debtor's post LBO earnings or directly from sale of the Debtor's assets.

These LBO "debts" known to the Court for which the Debtor received no consideration clearly exceeded the $4,000,000 present fair saleable value previously determined by the Court for the Debtor's assets. Therefore,

the Debtor was rendered insolvent when the asset value is compared to the probable liabilities as that equation stood immediately after the LBO with future liabilities included in the probable repayment amounts. In essence, the fair saleable value of the Debtor's assets, as reflected by the LBO "price", must be reduced at least by the amounts required to service the LBO debts. *See* Queenan at 16.

Having found that no genuine issue of material fact exists with respect to the insolvency of the Debtor immediately following the LBO, the Plaintiffs have established each of the elements required under Ohio Rev. Code § 1336.04 and, thus, are entitled to avoid the LBO transfers and obligations to these Defendants unless the Defendants can establish a defense to such avoidance as a matter of law. The two defenses raised by the Defendants in opposition to the Plaintiffs' avoidance of the LBO were considered and rejected as a matter of law in this Court's Opinion and Order on the Defendants' Cross-motion for Summary Judgment. These included the defense that leveraged buyout transactions, in general, and in particular the LBO in this case, should not be analyzed under the fraudulent transfer laws; and that the amounts the Defendants received for their shares in this LBO constituted margin or settlement payments which specifically may not be avoided under § 546(e) of the Bankruptcy Code.

The Court hereby adopts, and incorporates by reference in this opinion and order, the legal conclusions stated in its Opinion and Order on the Defendants' Cross-motion for Summary Judgment. Accordingly, these defenses are rejected as a matter of law.

### D. *Plaintiffs' Rights to Recover the Monies Paid to Defendants and to Annul the Debtor's Obligation Under the Guarantee*

As remedies, the Plaintiffs seek to recover the approximately $840,000 paid to the Defendants and to annul the $3,000,000 guarantee undertaken by the Debtor. The Defendants raise two other specific defenses as bars to such recovery and annulment: the savings clause provided by § 9 of the UFCA and the good faith transferee argument derived from either 11 U.S.C. §§ 548(c) or 550(b).

### 1. *The "Savings Clause" Defense*

Section 9 of the UFCA provides:

A purchaser, who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

Ohio Rev.Code § 1336.09.

This defense by its express terms is available only to "purchasers". The Defendants are not purchasers from the Debtor under the facts of this case and, therefore, would not fall within the protection of this provision. Even if the Defendants could somehow be considered purchasers within the meaning of the statute, consideration is required to obtain the benefit of the defense. The Debtor received no consideration from the Defendants in connection with the payment of the approximately $840,000 cash or the guaranty of the $3,000,000 note. *See Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 136 (Bankr. D.Mass.1989). Accordingly, this defense must be rejected.

### 2. *The Good Faith Transferee Defense*

Section 548 of the Bankruptcy Code provides in relevant part:

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

This action is not brought under § 548; therefore, any defense thereon is legally irrelevant to this adversary. Moreover, the Court has already found as a matter of law that the Defendants gave nothing of value to the Debtor. Accordingly, § 548 is not a valid

defense to the Plaintiffs' fraudulent transfer claim and, thus, does not preclude summary judgment on that claim.

■ Section 550 of the Bankruptcy Code states in pertinent part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The Trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a) and (b).

Because the Defendants were the initial transferees or beneficiaries of the $3,000,000 guarantee executed by the Debtor, § 550(b) has no application. Furthermore, as transferees, the Defendants did not, and the Court has already so found, give anything of value to the Debtor in return for such guarantee. Therefore, § 550(b)(1) offers no viable defense to the Plaintiffs' claim that the guarantee should be annulled.

■ The payment of the $840,000 to the Defendants presents a different situation, however, since the money presumably did not come directly from the Debtor, but rather came through GLL.[2] This $840,000 represented a substantial portion of the proceeds received by the Debtor as a result of the $1,000,000 Mortgage Loan. If GLL is, in fact, the initial transferee of those funds,

then § 550(b)(1) could apply to the Defendants as immediate or mediate transferees under § 550(a)(2). Under this scenario, assuming that the Defendants meet the requirements of § 550(b)(1), this defense would be available to them despite the fact that GLL, as an initial transferee, gave nothing of value to the Debtor in return for the $1,000,-000. *Merrill v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 126 (D.Utah 1986).

The Plaintiffs argue, however, that if the transactions between the Debtor and GLL and between GLL and the Defendants are collapsed into a single transaction, the Defendants would be the initial transferees of the $840,000. As such, the Defendants could not then claim the benefit of § 550(b)(1). *Cf. Ray v. City Bank & Trust Co. (In re C–L Cartage Co.),* 899 F.2d 1490, 1495 (6th Cir. 1990).

Courts have collapsed the various transactions in an LBO where the selling shareholders knew or should have known that the LBO would deplete the assets of the target company. *See Lippi v. City Bank,* 955 F.2d 599, 612 (9th Cir.1992). But, in this case, the Court finds that there are genuine issues of fact which exist with respect to the Defendants' actual, or even constructive, knowledge of this LBO.

Courts have also collapsed transactions in which the party initially receiving the funds from a debtor immediately transfers these funds to a third party, does not use any of the funds, and is intended by all of the parties to be a mere conduit. *See Billings v. Zions First Nat'l. Bank (In re Granada, Inc.),* 110 B.R. 548, 552–53 (Bankr.N.D.Ala. 1990). In such cases, the third party will be considered the "initial transferee" for purposes of § 550(a)(1). *Id.; see also Merrill,* 62 B.R. at 129.

Upon application of these factors to the LBO in this case, there is no question that GLL immediately transferred to the Defendants approximately $840,000 of the $1,000,-

---

**2.** Had GLL not even functioned as a conduit at closing, and the funds come directly from the Debtor, the Defendants would clearly have been initial transferees for whom the defense of § 550(b)(1) would not have been available. *See O'Donnell v. Royal Business Group, Inc. (In re Oxford Homes, Inc.),* 180 B.R. 1, 6 (Bankr.D.Me. 1995).

000 it received from the Debtor. There is also unrebutted evidence that Luke and Levy, the principals of GLL, viewed their entity as merely a conduit for the transaction. Deposition of George L. Levy, Vol. 1, page 121. Furthermore, the Bank may also have been aware of, and approved such transaction. *Id.* Once again, however, the Court finds a genuine issue of fact as to the Defendants' knowledge and intentions. They maintain that they were unaware even of the existence of GLL until the date of closing and that they believed rather than coming from the Debtor, the $1,000,000 was held by Luke and Levy "up front." Deposition of Robert E. Griffith, page 140.

The Court concludes that these issues of fact are material to the question of whether § 550(b)(1) affords the Defendants a viable defense to the Plaintiffs' recovery of the approximately $840,000 from the Defendants. Accordingly, summary judgment on this question must be denied.

### III. *Equitable Subordination of the Defendants' Claim*

█ As additional or alternative relief the Plaintiffs seek to subordinate any claims asserted against this Debtor's estate by the Defendants arising from the Debtor's $3,000,000 guarantee or from any repayment of the $840,000 to the estate which might result from this adversary action. Section 510(c)(1) of the Bankruptcy Code, which governs equitable subordination, states:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may . . ., under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .

11 U.S.C. § 510(c)(1).

█ The "principles of equitable subordination" referred to in this provision are to be derived from the relevant case law. *In re Future Energy Corp.*, 83 B.R. 470, 483 (Bankr.S.D.Ohio 1988) (citations omitted). Prior to the enactment of the Bankruptcy Code, the seminal case involving equitable subordination was *Benjamin v. Diamond*

*(Matter of Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977). *Benjamin* outlined a three-part test to determine whether equitable subordination is appropriate. The relevant factors include (1) whether the claimant has engaged in inequitable conduct; (2) whether the conduct has injured creditors or given unfair advantage to the claimant; and (3) whether subordination would be consistent with the provisions of the Bankruptcy Code. *Benjamin* at 700. With the enactment of § 510(c) of the Bankruptcy Code, the third factor has become superfluous. *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 628 (Bankr. N.D.Fla.1990).

To the extent that the *Benjamin* test still governs equitable subordination, the Plaintiffs' claim must fail because they have not established any inequitable conduct on the part of the Defendants. The Plaintiffs argue, however, that even where inequitable conduct is lacking, courts may subordinate a claim as a result of its nature or origin. *See, e.g., In re SPM Mfg. Corp.*, 163 B.R. 411, 414 (Bankr.D.Mass.1994). *See also United States v. Noland (In re First Truck Lines)*, 48 F.3d 210 (6th Cir.1995), *petition for cert. filed* (Aug. 24, 1995).

In *SPM*, the claim was for the balance due under a note delivered by the debtor in connection with the redemption of the claimant's shares of stock. 163 B.R. at 411. The court justified its subordination of the claim for the balance due on the note on the basis that only shareholders, and not creditors, have the ability to participate in profits. A redeeming shareholder, therefore, is attempting to recover "what is essentially a liquidating dividend on his stock." *SPM* at 416. In that court's view, sound policy dictates that such redemption debt must come behind general unsecured creditors because of the priority such creditors enjoy over shareholders in bankruptcy. *SPM* at 415 (citing *Robinson v. Wangemann*, 75 F.2d 756 (5th Cir.1935)).

█ This Court agrees with the Plaintiffs that the "principles of equitable consideration" referred to in § 510(c)(1) are broader than the test enunciated in *Benjamin*, and that inequitable conduct on the part of the

claimant need not always be present to justify subordinating a claim. Such a result, however, under certain circumstances, is more appropriately a reclassification or a finding that the claim is not enforceable in the manner in which it is asserted. The Court further agrees with Judge Queenan's analysis in *SPM* that stock redemption debt is properly subordinated to the claims of general unsecured creditors.

The undisputed facts in this case lead to the conclusion that the $3,000,000 note GLL executed in favor of the Defendants and the Debtor's guarantee of that note represent, in essence, a redemption of the Defendants' stock interests in the Debtor. The note was executed by GLL as the corporate entity used to acquire the Defendants' stock and the Debtor guaranteed that obligation. GLL had no means to pay that obligation. As previously determined by this Court, the Debtor received no consideration for its guarantee since any payment for the purchase of its own stock would constitute actually a reduction in net worth rather than the acquisition of an asset. *Vadnais Lumber*, 100 B.R. at 136.

Therefore, the Court concludes that whatever claims the Defendants are asserting against this bankruptcy estate arising from the $3,000,000 guarantee are more appropriately characterized as "claims" on account of their equity interests. Those equity interests are necessarily subordinate to the claims of unsecured creditors of this insolvent Debtor.[3] This finding, of course, pertains only to the estate of Structurlite Plastics Corporation and does not affect whatever rights the Defendants may have against other persons or entities arising from the $3,000,000 promissory note.

### IV. *Conclusion*

Based on the foregoing, the Court finds that the payments to the Defendants in connection with the LBO are avoidable under § 4 of the UFCA. Further, the $3,000,000 guarantee undertaken by the Debtor is annulled on summary judgment under § 4 of the UFCA.

In the alternative, the Court finds that any claims by the Defendants against the Debtor's bankruptcy estate arising from the Debtor's guarantee of the $3,000,000 note are subordinated to the allowed claims of all unsecured creditors. Such "claims" of the Defendants are reclassified as interests arising from equity positions.

The Plaintiffs may not, however, on summary judgment recover the approximately $840,000 actually received by the Defendants because genuine issues of material fact exist with respect to whether the Defendants may properly assert the defense under § 550(b)(1) as a bar to such recovery.

The Plaintiffs further are not entitled to summary judgment on their claims brought pursuant to former Ohio Rev.Code § 1336.05 because genuine issues of material fact exist with respect to whether the LBO left the Debtor with unreasonably small capital.

For the foregoing reasons, the Plaintiffs' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part. Judgment, in part, shall be entered in favor of the Plaintiffs on count one of their Complaint, and the obligation of the Debtor with respect to its $3,000,000 guarantee is hereby annulled. Judgment is granted as to the avoidability of the $840,000 transfer, but not as to recovery against these Defendants. Judgment is denied as to count two of the Complaint. Judgment, in part, shall also be entered in the alternative in favor of the Plaintiffs on count eleven of their Complaint as to the subordination or reclassification of the Defendants' claims arising from the Debtor's $3,000,000 guarantee. A pretrial conference on all remaining matters in this adversary proceeding shall be held at 3:00 p.m. on January 11, 1996, United States Bankruptcy Court, Courtroom C, 170 North High Street, Columbus, Ohio 43215.

**IT IS SO ORDERED.**

---

**3.** The Defendants have presently not returned, or even been ordered to return, the approximately $840,000 which they actually received in return for their shares. As a result, they do not, and cannot, assert a claim against the estate with regard to those monies at this time. It would, therefore, be premature for this Court to express any opinion as to the equitable subordination of any future claim by the Defendants in the event such monies are paid back.